# DWINELL–WRIGHT CO. v. NATIONAL FRUIT PRODUCT CO., Inc.

## No. 3896.

Circuit Court of Appeals, First Circuit.

Feb. 2, 1944.

See, also, 42 F.Supp. 1016; 129 F.2d 848.

Edward G. Fenwick, Charles R. Fenwick, and Mason, Fenwick & Lawrence, all of Washington, D. C., and Simon P. Townsend and Choate, Hall & Stewart, all of Boston, Mass., for appellant.

Clarence B. Des Jardins, of Cincinnati, Ohio, and Gilman P. Welsh, and Harwood & Welsh, all of Boston, Mass., for appellee.

Before MAHONEY and WOODBURY, Circuit Judges, and HEALEY, District Judge.

WOODBURY, Circuit Judge.

This is an appeal by the defendant in a suit for trade-mark infringement and unfair competition from so much of a decree of the District Court of the United States for the District of Massachusetts as (1) enjoins it from making any further use of the trade-mark "White House", whether accompanied by a representation of the Executive Mansion or not, in connection with the sale of fruit or vegetable juices for food purposes, and (2) dismisses its counterclaim in which it charged the plaintiff with trade-mark infringement.

The plaintiff-appellee, National Fruit Product Company, Inc., a Virginia corporation, is the owner of five registrations [1] of the trade-mark "White House", either standing alone or accompanied by a representation of the Executive Mansion, covering a line of fruit (principally apple) and some vegetable products and juices. The defendant-appellant, Dwinell-Wright Company, a Massachusetts corporation, is the owner of three registrations [2] of the same trade-mark covering tea, coffee and salted peanuts.

In May, 1941, the defendant added to its line of coffee, tea and salted peanuts a blend of canned orange and grapefruit juice which it marketed under the trademark "White House" and thereupon the plaintiff brought the instant suit in which it charged that the defendant by so doing had begun to infringe its trade-mark and to compete unfairly [3] with it. The defendant answered denying these charges and

| [1] No. | Date | Particular description of goods to which trade-mark appropriated. |
|---|---|---|
| Renewed 104,641 | June 8, 1915 | apple cider vinegar |
| Renewed 121,723 | May 21, 1918 | apple cider |
| 299,846 | Dec. 27, 1932 | apple products, namely canned apples, apple jelly, apple jam, marmalade, applesauce, vinegar and table apples, and apple butter. |
| 316,305 | Aug. 21, 1934 | canned fruits, fruit jellies, fruit marmalades, fruit preserves, evaporated apples, fruit pectin, and distilled vinegar. |
| 336,489 | July 7, 1936 | fruit and vegetable juices for food purposes. |

| [2] No. | Date | Particular description of goods to which trade-mark appropriated. |
|---|---|---|
| Renewed 77,624 | Apr. 26, 1910 | tea |
| Renewed 77,625 | Apr. 26, 1910 | coffee |
| 388,899 | July 15, 1941 | salted peanuts |

[3] The court below found against the plaintiff on his charge of unfair competition and it has not appealed.

filed a counterclaim in which it charged that the plaintiff had been infringing its trade-mark ever since it began to use "White House" on its line of products.

In its counterclaim the defendant did not charge the plaintiff with unfair competition. Neither party alleges that the other has abandoned its use of the disputed mark on the products listed in footnotes 1 and 2 above, or denies that the other is engaged in interstate commerce. The facts necessary to sustain federal jurisdiction over both the suit and the counterclaim on the ground of diversity of citizenship and amount in controversy are admitted and have been found by the court below.

After full hearing the district court found that the fruit and vegetable juices marketed by the plaintiff are not merchandise of substantially the same descriptive properties as the tea, coffee and salted peanuts marketed by the defendant and that there is no substantial likelihood that the plaintiff's fruit and vegetable juices would be regarded by prospective purchasers as coming from the same source as the above listed goods of the defendant. But it found that the defendant's orange and grapefruit juice is merchandise of the same descriptive properties as the plaintiff's line of products, and that there is great likelihood that, because it is a fruit juice, it will be mistaken for the plaintiff's wares for the reason that the latter has marketed other fruit juices. It found that the registrations of both parties were valid. In consequence it concluded as matter of law that the plaintiff's registrations were infringed by the defendant's sale of its blend of canned orange and grapefruit juice under the trade-mark "White House" and that the defendant's registrations had not been infringed by the plaintiff.[4] Consequently, damages having been waived, the district court entered the decree from which the defendant has taken this appeal.

Since the plaintiff has not appealed from the dismissal of its alleged cause of action for unfair competition and since the defendant in its counterclaim made no charge of that nature, only questions of trade-mark infringement are before us on this appeal. These questions are: (1) Did the defendant infringe the plaintiff's registrations of the trade-mark "White House" for fruit and vegetable products and juices when it put its canned blend of orange and grapefruit juice on the market under that mark in 1941, and (2) has the plaintiff been infringing the defendant's registrations of that mark for tea and coffee ever since it began to use it on its line of fruit and vegetable products and juices?

At the outset we are confronted with the question of what law to apply. Should federal law be applied because both parties have registered the mark under the Trademark Act? Or should the law of Massachusetts be applied under the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A. L.R. 1487, because there is a basis for federal jurisdiction on the ground of diversity of citizenship and amount in controversy? The court below concluded that on the question of infringement of registered trade-marks the applicable law is federal statutory law, and where that is ambiguous or silent, federal case law, and we agree.

The point is not by any means free from doubt and difficulty as the Supreme Court clearly indicated by granting certiorari in Pecheur Lozenge Co., Inc., v. National Candy Co., Inc., 315 U.S. 666, 62 S.Ct. 853, 86 L.Ed. 1103, expressly in order to consider it. But in the above case the Supreme Court was thwarted of its purpose because upon examination of the record it appeared that the petitioner's labels had been registered under the Copyright Law of the United States, 17 U.S.C.A. § 1 et seq., not under the Trademark Law. In consequence we are left for the present without controlling authority. The question, however, has recently been carefully considered, not only by the court below in the instant case,[5] but also by S. S. Zlinkoff in Erie Railroad v. Tompkins; In Relation to the Law of Trade-Marks and Unfair Competition, 42 Columbia Law Review 955, and by the United States Circuit Court of Appeals for the Seventh Circuit in Time, Inc., v. Viobin Corporation, 128 F.2d 860, certiorari denied 317 U.S. 673, 63 S.Ct. 78, and Philco Corporation v. Phillips Mfg. Co., 7 Cir., 133 F.2d 663, and in view of these authorities, which are all in agreement, we think it would serve no useful purpose for us to consider it again in this opinion. It will suffice for us to say that the reasoning of

---

[4] The district court added that even if the defendant's registrations had been infringed by the plaintiff the defendant by reason of its laches could not be heard to complain.

[5] D.C., 47 F.Supp. 499.

the authorities cited above persuades us that the result reached by the court below is correct.

We turn now to the substance of the controversy.

Chapter 3—Trade-Marks, of Title 15 of the United States Code Annotated (15 U.S.C.A. §§ 81–134) after making provision for registration in the Patent Office (§ 81) of certain kinds of trade-marks (§ 85) provides in § 96 that:

"Any person who shall, without the consent of the owner thereof, reproduce, counterfeit, copy, or colorably imitate any such [registered] trade-mark and affix the same to merchandise of substantially the same descriptive properties as those set forth in the registration, * * * and shall use, * * * such reproduction, counterfeit, copy, or colorable imitation in commerce among the several States, * * * shall be liable to an action for damages therefor at the suit of the owner thereof; * * *."

■ From this section it is readily apparent that an owner of a registered trade-mark can recover for infringement only upon proof that the alleged infringer's merchandise is *"merchandise of substantially the same descriptive properties"* as those set forth in his (the plaintiff's) registration, and that, on such merchandise, without his consent and in interstate commerce, the defendant is using a *"reproduction, counterfeit, copy, or colorable imitation"* of the registered mark.

■ Since neither party contends that it is using the mark with the consent of the other and since each admits that the other is engaged in interstate commerce, the crucial questions on this appeal are the meanings of the statutory phrases quoted and italicized in the preceding paragraph.

The cases on the meaning of the phrase "merchandise of substantially the same descriptive properties" as used in the section of the statute quoted from above and those on the meaning of a very similar phrase in the section in which the kind of marks which may be registered are defined, § 85, are far too numerous to attempt to catalogue here. They can readily be found in the texts and digests. In some of them doubt is expressed as to whether or not the phrases have the same meaning in both sections of the statute,[6] but however this may be it is perfectly clear from all of them that in neither section does the phrase mean, as in vacuo it might be taken to imply, that consideration must be limited only to the physical properties of the goods themselves. This is illustrated by the cases in which an owner of a registered trade-mark has been given protection against one who is using his mark, or one much like it, on wholly dissimilar goods which are not, strictly speaking, even competitive. For instance one who had registered the trade-mark "Aunt Jemima", accompanied by a picture of a laughing negress, for self-rising flour was given protection against one who used the same mark for pancake syrup and sugar cream (Aunt Jemima Mills v. Rigney & Co., 2 Cir., 247 F. 407, L.R.A. 1918C, 1039, certiorari denied 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540), and one who had registered a given mark for fountain pens was protected against another who used a very similar mark for safety razor blades. L. E. Waterman Co. v. Gordon, 2 Cir., 72 F.2d 272. But compare Beech-Nut Packing Co. v. P. Lorillard Co., 3 Cir., 7 F.2d 967, affirmed 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810, in which an owner of a mark for food products was not given protection against the use by another of a substantially similar mark on chewing tobacco and cigarettes.

■ In cases like the above it is sometimes said that an owner of a trade-mark will be accorded protection not only against the use of his mark upon the articles to which he has applied it, but also against its use upon goods of different species which he may in the future desire to produce, if they belong in the same class. See Layton Pure Food Co. v. Church & Dwight Co., 8 Cir., 182 F. 35, 37, 32 L.R.A.,N.S., 274; Beech-Nut Packing Co. v. P. Lorillard Co., 3 Cir., 7 F.2d 967, 970, affirmed 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810. The use in this statement without detailed definition of words having such vague limits of meaning as "species" and "class" detracts

---

[6] See Philco Corp. v. Phillips Mfg. Co., 7 Cir., 133 F.2d 663, 673, footnote 8, but compare Yale Electric Corp. v. Robertson, 2 Cir., 26 F.2d 972, 974, in which Judge Learned Hand wrote: "It would plainly be a fatuity to decree the registration of a mark whose use another could at once prevent", and see California Packing Corp. v. Tillman & Bendel, Inc., 40 F.2d 108, 17 C.C.P.A., Patents, 1048; California Fruit Growers Exchange v. Windsor Beverages, Ltd., 7 Cir., 118 F.2d 149.

from, if it does not destroy, its usefulness as a touchstone for the decision of cases. A somewhat more precise statement of the principle is that "a trade-mark protects the owner against not only its use upon the articles to which he has applied it but also upon such other articles as might naturally or reasonably be supposed to come from him. Protection extends to all goods of the same class even though the alleged infringement is not upon the same species of articles". California Fruit Growers Exchange v. Windsor Beverages, Ltd., 7 Cir., 118 F.2d 149, 152, 153. But even this statement of the doctrine of natural expansion of business, as it is sometimes called, leaves much to be desired. However, we do not feel impelled to press our consideration of it further because, if the doctrine applies to trade-mark infringement cases as well as to cases of unfair competition, and we see no reason why it should not in spite of the doubts which have been expressed (see Rosenberg Bros. & Co. v. Elliott, 3 Cir., 7 F.2d 962; Emerson Elec. Mfg. Co. v. Emerson Radio & Phonograph Corp., 2 Cir., 105 F.2d 908; Walgreen Drug Stores, Inc. v. Obear-Nester Glass Co., 8 Cir., 113 F.2d 956, 963), it seems to us only a way of stating the application to a particular situation of the broader rule established by the cases that the basic test of trade-mark infringement is whether the goods of the alleged infringer would be supposed by the kind of people who purchase them to emanate from the same source as the goods of the complainant.[7] Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 247 F. 407, L.R.A.1918C, 1039 certiorari denied 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540; Standard Oil Co. v. California Peach & Fig Growers, Inc., D.C., 28 F.2d 283; Philco Corp. v. Phillips Mfg. Co., 7 Cir., 133 F.2d 663, 671. See also 3 Am.Law Institute, Restatement of Torts, ch. 35, particularly § 717. Admittedly the words of the statutory phrase were not happily chosen to express this test but it is said, and we agree, that the

test is unmistakably indicated because the dominant purpose of the statute is to prevent confusion and deception. See Nims on Unfair Competition and Trade-Marks (third edition), § 229(b); Yale Electric Corporation v. Robertson, 2 Cir., 26 F.2d 972; California Packing Co. v. Tillman & Bendel, Inc., 40 F.2d 108, 17 C.C.P.A., Patents, 1048.[8]

▪ To apply this test, however, not only must the similarities of the respective goods be considered but also the nature of and, when the marks are not identical, the points of similarity between the respective marks used on them. Wholly dissimilar goods, even if sold under practically identical marks, would not in reason be supposed to come from the same source, and the same may be said as to relatively similar goods if sold under marks bearing only the remotest resemblance to one another. Confusion in the mind of the purchasing public as to the source of goods can only arise when there is some substantial similarity between both the goods and the marks under which they are sold. To illustrate: It is safe to say that no reasonable person would suppose that articles as dissimilar as steam-shovels and butter would come from the same source even though the trade-marks thereon were practically identical, but, on the other hand, most purchasers would be inclined to believe that butter and cream, if marketed under trade-marks bearing even slight similarity, were produced by the same manufacturer. And the same can be said of steam-shovels and steam-rollers, although to a lesser degree, because such goods are expensive, there are fewer manufacturers of them, and those who purchase them, in most instances at least, are experts who not only would be less influenced by a trade-mark but would also be more apt to know the distinguishing marks of the different manufacturers in the field and to distinguish more nicely between them.

Between the extreme situations just mentioned there lies a wide range of goods and

[7] If it is probable that the owner of a registered trademark and another may become competitors by the expansion of the owner's business into a related line, it indicates that the goods are sufficiently related so that an association of them by the public with a single source is likely. 3 Am.Law Institute, Restatement of Torts, § 731 comment c.

[8] See also Section 5 of the Trade-mark Act, 15 U.S.C.A. § 85, which denies registrability to "trade-marks which are identical with a registered or known trade-mark owned and in use by another and appropriated to merchandise of the same descriptive properties, or which so nearly resemble a registered or known trade-mark owned and in use by another and appropriated to merchandise of the same descriptive properties as to be likely to cause confusion or mistake in the mind of the public or to deceive purchasers."

marks of varying degrees of similarity and it is in this range that questions of trademark infringement naturally become acute.

■ As to the respective goods it is of course important to consider their similarities of appearance and use. But in addition other factors are of equal and in some cases may be of even greater importance. Some of these are whether the goods are ordinarily sold in the same kind of retail stores, as grocery stores or hardware stores, whether they are ordinarily produced by the same manufacturers, whether they have common purchasers, and whether they are ordinarily purchased by the public generally or only by professional buyers, to mention only some of the pertinent consideration. See Am.Law Institute, Restatement of Torts, § 731, et seq.

■ As to the marks used it is important to consider not only the similarity of sound and spelling of the words employed, but also the setting in which they appear. That is, the methods by which they are affixed to the goods, the similarity in color, shape or format of the labels and the kind of type in which they are printed, as gothic or script for instance. Another important consideration is the character of the mark, whether it is a strange, arbitrary and fanciful word like "Kodak" or a common word having a general connotation, usually of excellence, like "Blue Ribbon", "Gold Medal" or "Universal"; in other words, whether it is a "strong" or a "weak" mark, because purchasers are more likely to associate goods, even relatively unrelated goods, sold under a strong mark with the same manufacturer than they are more closely related goods sold under a weak one. France Milling Co., Inc., v. Washburn-Crosby Co., Inc., 2 Cir., 7 F.2d 304, 306, certiorari denied 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168; Philco Corp. v. Phillips Mfg. Co., 7 Cir., 133 F.2d 663, 672, 673, and cases cited.

■ In short, the phrases which we have under consideration are inter-related. In cases such as this then, both the similarities of the goods and of the marks used upon them must be considered together in order to arrive at an answer to the ultimate question of the likelihood of consumer confusion as to source. And to answer this question it is apparent that testimony may cover a wide range and that a great many factors must be considered, evaluated and related to one another. Thus the ultimate question of infringement is one of the type ordinarily classified as one of fact (see Rosenberg Bros. & Co. v. Elliott, 3 Cir., 7 F.2d 962, 964; France Milling Co. v. Washburn-Crosby Co., Inc., supra), and as such it is one primarily for the fact-finding tribunal—in this case the district court—reviewable here only for clear error under Rule 52 (a) Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Consequently we turn our attention to the evidence in the record to see if what there appears warrants the conclusions reached thereon by the court below.

A partnership known as Dwinell & Company started in the wholesale grocery business in Boston in 1843, and another partnership known as Hayward & Company started in the same business in the same city in 1849. Both continued in business until 1877 when they merged into a partnership known as Dwinell-Hayward & Company. At some time prior to January, 1888, this partnership began to sell coffee under the trade-mark "White House" and a representation of the Executive Mansion, and it and its successors have done so ever since. Subsequent to this the partnership changed its name to Dwinell-Wright & Company and then was transformed into the defendant corporation which acquired the entire assets, business, good-will and trade-marks of its predecessor-partnership. It has sold tea under the above trade-mark since prior to 1907; it has sold salted packaged peanuts since December, 1940, and in May, 1941, it added a canned blend of orange and grapefruit juice to the line of products it sold under the mark and so precipitated the present litigation.

The history of the plaintiff's use of the same mark is as follows: The Semmes, Kelly Company, under the title of Semmes, Kelly & Board Company, of Winchester, Virginia, began to sell cider vinegar under the trade-mark "White House" about 1906 or 1907, and continued to do so until the Board, Armstrong Company took over its business about September 1, 1908. This latter company continued the business until the present plaintiff succeeded it on March 1, 1913. The plaintiff and its predecessors exploited the mark extensively. Board, Armstrong & Company began to use it on sweet apple cider at some time between 1908 and 1913, and the plaintiff applied it to canned apples in 1918, applesauce in 1920, apple butter in 1924, apple jelly in 1931, apple pectin, evaporated apples, and concen-

trated apple juice in 1935, prune juice in 1937,·and apple juice in 1938.

On the basis of the above the Dwinell-Wright Company contends that it must be found that it adopted the mark before the National Fruit Product Company and that from this it follows that it should have protection because its goods are of substantially the same descriptive properties as the goods of the latter company. We concede that the Dwinell-Wright Company was the first user of the mark but not that it has made out a case of consumer confusion and thus of substantial similarity of descriptive properties as a matter of law.

Its argument is that its goods, particularly coffee and tea, and those of the plaintiff are likely to be identified by purchasers with the same source because both are classified under the heading of groceries, both are sold at the same retail stores, both are handled by the same wholesalers, both are purchased by the same class of people, both are potables used on the table, usually at breakfast, both sell for comparatively little, and both are frequently put out by the same producers, that is, many persons engaged in business as coffee roasters and tea merchants also put out fruit and vegetable juices using the same mark and similar labels for both lines. All this may be true but as Mr. Justice Holmes said in Schlitz Brewing Co. v. Houston Ice Co., 250 U.S. 28, 29, 39 S.Ct. 401, 63 L.Ed. 822, "It is a fallacy to break the fagot by stick." Cases of this sort are not to be decided on individual points of similarity alone, important as these points may be, but by looking at the over-all pictured, otherwise, the fact-finder might fail to see the forest for the trees. And in spite of points of similarity noted above there are important differences.

■ Tea and coffee both necessarily have to be imported, both are beverages of a distinctive and of almost a unique type, (substitutes for them are rare and but little used) both, but particularly coffee which must be roasted and ground, are prepared for the market in a way not commonly used for the preparation of other drinks, that is, in the form of small dehydrated particles, and both are prepared for consumption by infusing or steeping in hot water in some way. Also coffee and tea have a relatively unique and in many respects a similar history of use and commercial exploitation. In view of these features which set coffee and tea apart from fruit and vegetable juices, and in view of the fact that the name "White House" and a representation of the Executive· Mansion constitute a "weak" mark (it obviously has patriotic and what the court below called "honorific" significance and it furthermore appears to· have been registered 73 times apart from the registrations of the parties, 38 of which are for various foods and beverages), we cannot say that the court below was clearly in error in concluding that there was no substantial likelihood that purchasers of the plaintiff's goods would confuse them with the defendant's with respect to source.

■ The same, however, cannot be said with respect to the plaintiff's fruit and vegetable juices, particularly prune and apple juice, and the defendant's blend of orange and grapefruit juice. These products do not have the points of dissimilarity noted above; on the contrary they are very much alike, in fact they are so much alike in their attributes and uses and in the methods and manner in which they are produced and marketed that it is not at all unreasonable to conclude that in spite of the weakness of the mark there is real likelihood of consumer confusion as to their source.

Our conclusions are not altered by the fact 'hat over the years the defendant has expended in excess of four million dollars in advertising the mark whereas plaintiff, insofar as the record discloses, has not expended anything for that purpose.

It follows that the findings made below should stand and in consequence we need not consider whether the defendant has been guilty of laches.

■ This brings us to the consideration of certain criticisms leveled by the appellant at the opinion of the district court. It says that that court reached its conclusion in an "extraordinary" and erroneous manner because "the evidence presented to the court in great volume and at great expense by the defendant is brushed aside on the strength of essays, magazine articles and brochures not offered in evidence nor cited by either party". From a careful reading of the memorandum opinion we do not believe that the court below overstepped the bounds placed upon its authority to go outside the record for facts as marked out for it in Friend v. Burnham & Morrill Co., 1 Cir., 55 F.2d 150, 151, and cases cited.

Other criticisms of the appellant with respect to the opinion of the district court, questions raised by it with respect to a cer-

tain assignment and to the application of the clean hands doctrine have all been considered by us, but in our opinion do not need to be discussed.

The decree of the District Court is affirmed with costs to the appellee.