65 F.Supp. 952 (1946)
TRIANGLE PUBLICATIONS, Inc.,
v.
HANSON et al.
No. 3462.
District Court, E. D. Missouri, E. D.
May 16, 1946.
*953 Samuel H. Liberman and Shepley, Kroeger, Fisse & Ingamells, all of St. Louis, Mo., and Bell, Murdoch, Paxson & Dilworth, of Philadelphia, Pa. for plaintiff.
Howard Elliott, Aubrey B. Hamilton, and G. T. Priest, all of St. Louis, Mo., and Charles Sonnenreich, of New York City, for defendants.
DUNCAN, District Judge.
Plaintiff is a corporation organized under the laws of the State of Delaware, with its principal office in Philadelphia, Pennsylvania. It is the publisher of the Philadelphia Public Ledger and of numerous other publications, including the magazine "Seventeen" which is published in the City of New York and devoted to the interests of girls in the teen age group, from 13 to 17 or 18 years of age.
The defendants Gilbert E. R. Hanson and Joseph Schwartz, are co-partners, residents of the City of St. Louis, Missouri, and engaged in the manufacture and sale to retailers of dresses for teen age girls, under the trade name "Seventeen for the Junior Teens."
Plaintiff alleges that it is the owner of the trademark "Seventeen" and that the defendants have copied said trademark, and have been guilty of unfair trade practices in the use of said name in the advertising *954 and sale of their dresses under the trade name "Seventeen for the Junior Teens".
In their brief the defendants attack the jurisdiction of the court on the ground that there is no substantial allegation in plaintiff's complaint as to the validity of the trademark "Seventeen," and that on account thereof, the action for unfair trade practices must be based upon diversity of citizenship and jurisdictional amount, and insist that there is complete lack of any showing as to the jurisdictional amount, and that the court therefore, is without jurisdiction to try and determine the case on its merits.
The defendants deny the validity of the trademark "Seventeen"; deny that they have been guilty of unfair trade practices with respect thereto, and contend that there can be no unfair competition between the publisher of a magazine and the manufacturer of girls' dresses, because the businesses are dissimilar and their merchandise not of the "same descriptive properties."
By way of counterclaim, defendants contend that the plaintiff wrongfully threatened certain department stores, manufacturers of fabrics from whom defendants purchased materials, and other persons who were purchasers, or about to become purchasers of defendants' merchandise, with suits for infringement if they continued to deal or dealt with the defendants in the purchase and sale of defendants' merchandise to be sold under the trade name "Seventeen for the Junior Teens."
With regard to the jurisdiction of the court, the plaintiff alleges inter alia that it is the owner of the trademark "Seventeen" which has been registered in the United States Patent Office, and that the defendants have wrongfully appropriated the word as its trade name in the manufacture of teen age dresses.
A substantial allegation of the registration of a trademark under the Act of 1920, 15 U.S.C.A. § 85, 41 Stat. 535 is sufficient to give the District Court jurisdiction of the merits. Armstrong Paint & Varnish Co. v. Nu-Enamel Corp., 1939, 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195; Dwinell-Wright Co. v. National Fruit Products Co., 1 Cir., 1944, 140 F.2d 618.
Moreover, it is a well settled principle of law that where the court acquires jurisdiction under the Trade-Mark Act, even though the court find against the plaintiff as to the validity of the trademark, the court will retain jurisdiction and determine the issues upon the merits. Armstrong Paint & Varnish Co. v. Nu-Enamel Corp., supra; Dwinell-Wright Co. v. National Fruit Products Co., 1 Cir., 140 F.2d 618 supra; Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148; Lewis v. Vendome Bags, 2 Cir., 1939, 108 F.2d 16.
It seems to me that the allegation with respect to the registration, ownership and infringement of the trademark is plainly substantial and is sufficient to confer jurisdiction upon this court.
There is no question about the residence of the parties and the diversity of citizenship. At the conclusion of the trial, one of counsel for defendants stated: "Mr. Priest: May I correct one idea, Your Honor, as to the question of jurisdiction? There is no question of the Court's jurisdiction at all in this matter; the diversity of citizenship is sufficient. But coming to apply the law of unfair competition, the cause of action having arisen in this jurisdiction, the Missouri law would govern."
While there is no direct proof as to any loss sustained as a result of the infringement of the trademark, or because of unfair competition or trade practices, it would seem that because of the very nature of the case, considering the extent of the circulation of plaintiff's magazine  750,000; the charge for advertising ($1800 a page), and the extent of the sales of defendants' merchandise, the amount involved is in excess of $3000. The question of jurisdiction upon either theory is ruled against defendants.
The next question raised by the defendants is that of the validity of the trademark. A fuller understanding of the facts regarding the selection of the name "Seventeen" and its significance, will be desirable. For a number of years prior to the middle of May 1944 the plaintiff had been *955 publishing a magazine known as "Stardom." It was deemed advisible to abandon the publication of that magazine and to publish a different type of magazine under another name, and the name "Seventeen" was selected. The new publication to be devoted exclusively to the problems of girls between the ages of 13 and 17 or 18 years of age, particularly with respect to style in all of its complicated phases; to cosmetics, and to other objects of personal adornment; to written articles dealing with the problems of this teen age group of girls in their relations with each other, with their seniors, with their families and with their country. In short, it was to be a magazine devoted to the physical, esthetic, psychological and educational problems of girls 13 to 17 or 18 years of age.
In its appeal to this group of girls, plaintiff proposed to advertise extensively such commodities as above mentioned, produced by the various manufacturers of the country. Naturally a name which would immediately be suggestive of the purposes of the magazine and appeal to the group to which it was to be directed was of the utmost importance. The name "Seventeen" was suggested by the book "Seventeen" written by Booth Tarkington in 1915. A reading of that interesting book and an analysis of the characters portrayed by the author, all of whom were teen-agers from 17 down, immediately will suggest the significance of the name "Seventeen."
To use the words of Mrs. Valentine, the editor-in-chief"the name epitomizes the very spirit of the group of girls I hoped to reach." Before the adoption of the name, a communication was addressed to Booth Tarkington requesting his permission for its use, and such permission was granted.
It is a well recognized fact that this particular group of young people, both male and female, pass through a state of mind on their way to womenhood and manhood that is experienced at no other period in life. Their parents and teachers are thoroughly familiar with the condition and the problems resulting from it. To some extent they have a language of their own, certain types of clothing appeal to them, their problems weigh more heavily upon them and attain greater significance than at any other period in life. It is therefore natural that in the publication of a magazine to appeal to this particular group, realizing their state of mind, their problems and their customs, a word which would immediately upon sight reflect their interest and problems, would be highly desirable. The publisher of the magazine thought the word "Seventeen" did just that.
The magazine is approximately 10 × 13 inches in size and the word "Seventeen" appears across the top of the cover page in letters approximately two inches in height and of a width in proportion to the size of the magazine. Also upon the colored cover is usually to be found the picture of a very attractive young girl clothed in apparel suitable to her particular type. So it was with all of these things in mind that the name "Seventeen" was selected as the name of the magazine.
On August 22, 1944, plaintiff filed an application for the registration of the name "Seventeen" as a trademark, and on January 9, 1945, the Commissioner of Patents issued to plaintiff certificate of registration No. 411,294.
The defendants contend that the word "Seventeen" is a descriptive word; that it is descriptive of the age of a person. I am inclined to believe that it is suggestive rather than descriptive  suggestive of youth and adolescence. Application of Stephens-Adamson Mfg. Co., 49 App.D.C. 181, 262 F. 635; Reardon Laboratories v. B & B Exterminators, 4 Cir., 1934, 71 F.2d 515; Industrial Rayon Corp. v. Dutchess Underwear Corp., 2 Cir., 1937, 92 F.2d 33, certiorari denied 303 U.S. 640, 58 S.Ct. 610, 82 L.Ed. 1100; General Shoe Corp. v. Rosen, 4 Cir., 1940, 111 F.2d 95; Pennzoil Co. v. Crown Central Petroleum Corp., D.C.D.Md.,1943, 50 F.Supp. 891, affirmed 4 Cir., 140 F.2d 387, certiorari denied 322 U.S. 750, 64 S.Ct. 1261, 88 L.Ed. 1581; Gannert v. Rupert, 2 Cir., 1904, 127 F. 962; In re One Minute Washer Co., 95 F.2d 517, 25 C.C.P.A., Patents, 978; Esquire, Inc. v. Esquire Bar, D.C.S.D.Fla., 1941, 37 F.Supp. 875.
The defendants also contend that at the time they appropriated the name "Seventeen" *956 as their trademark, it had not attained a secondary meaning or significance, identifying it as plaintiff's magazine. In this regard, plaintiff contends that it must have attained such significance as the property of the plaintiff.
A determination of this question requires a further brief history of the organization of the magazine "Seventeen" and what was done in connection with its promotion. As heretofore stated, it was determined in May 1944 to publish a magazine devoted to the interest of the teen age group of girls. To a very large extent the new publication took over the organization and personnel of its predecessor  "Stardom."
After the selection of the new name, and during the month of August 1944 in excess of $35,000 was expended in advertising the name "Seventeen." The first publication came out on September 1, 1944 and contained 86 pages, 46 pages of which were devoted exclusively to the advertising of teen age apparel, and had a circulation between 380,000 and 385,000. Between the first of August and the end of December, 1944 in excess of $150,000 had been expended in radio, newspaper, trade journal and school paper advertising. Such advertising was very largely directed to those persons engaged in the manufacture and sale of the so-called "teen age" apparel, and from whom the magazine obtained, or expected to obtain, its advertising.
The magazine grew rapidly in size and in circulation. The March edition, attached to the Complaint, had 160 pages. In view of the rapid increase in circulation and the extent of the advertising campaign incident to the publication of the magazine, it would clearly seem that the name had attained a secondary meaning.
"No particular period of use is required. In some cases the special significance is not acquired even after an extended period of use; in others it is acquired after a brief period. The issue in each case is whether or not in fact a substantial number of present or prospective purchasers understand the designation, when used in connection with goods, services or a business, not in its primary lexicographical sense, but as referring to a particular person or association." Restatement of Torts, Vol. 3, Sec. 716 comment d.
That the name had attained a secondary meaning may further be attested by the number of inquiries from persons almost immediately after its launching, seeking permission to use the name "Seventeen" as the name of some product such persons were creating.
In fairness to the defendants, only one of whom testified, it was stated that they did not know at the time they appropriated the name that it had been adopted and was being used as the name for the publication of plaintiff's magazine. This however, will be discussed later in this memorandum.
Thus it would clearly seem that the name "Seventeen" had acquired a secondary meaning as plaintiff's publication. The word is arbitrary and fanciful, is susceptible of appropriation for individual and exclusive use; it "epitomizes" the spirit of the group of girls to which the magazine is intended to appeal. Plaintiff is therefore entitled to its exclusive use as a trademark in the publication of its magazine and in the conduct of the business incident to its publication, sale and distribution.
We come now to the more perplexing question as to whether or not there can be unfair competition between the plaintiff in the publication of its magazine and the defendants in the manufacture and sale of their dresses for teen age girls. Defendants say not. They contend that even though the word "Seventeen" be valid as a trademark, and that it had attained a secondary meaning, yet as the publishing of a magazine and the manufacture of girls' dresses are not of the same descriptive properties as defined in the statute, 15 U.S. C.A. § 85, 41 Stat. 535, that there can be no competition, and that there could be no palming off of the goods of one for the goods of the other.
At this point it may be well to state the defendants' position with respect to its selection of the trade name "Seventeen for the Junior Teens" and the fact that the defendants insist upon their right to use it *957 notwithstanding the use of the word "Seventeen" by the plaintiff as a name of its magazine.
For many years prior to the summer and fall of 1944 defendant Hanson had been engaged in the manufacture of women's apparel, and for nine years prior thereto, had been employed by the Forest City Manufacturing Company of St. Louis, and had enjoyed phenomenal success with that company. For some time prior to the summer of 1944 the defendant Hanson had entertained a desire to engage in the manufacture of dresses for the so-called "teen-age" group of girls, on his own behalf, and had discussed his desired venture with a number of his friends, but it was not until July 31, 1944 that he actually resigned his position with the Forest City Manufacturing Company and began the organization of his own business.
According to defendant Hanson's testimony, the name "Seventeen" was first suggested to him by one of his friends as early as 1942, but he rejected the suggestion as not being appropriate, he having in mind numerous other names. Seemingly, it is a custom among manufacturers of dresses to adopt a trade name under which such dresses are sold. On October 9, 1944 more than thirty days after the first publication of the magazine "Seventeen" the defendants decided to adopt the name "Seventeen for the Junior Teens" as a trade name for their proposed line of dresses, and caused a telegram to be sent to Mr. Sonnenreich, one of the attorneys in this case, to inquire whether or not it could be used The telegram[1] definitely discloses that on October 9 the defendants knew of the magazine "Seventeen." Mr. Sonnenreich caused a search to be made in the copyright office section covering dresses. No such name had been recorded in that section and Mr. Sonnenreich so reported and advised that in his opinion the name "Seventeen" might be adopted and used by defendants.
Hanson says that the selection of the name "Seventeen" by the defendants was prompted by a demand for a new size "7" dress for young girls, and that by joining the numeral "7" to the often used word "teen" in referring to girls in the age group for whom he proposed to manufacture dresses, resulted in "7-teen." However, in none of defendants' advertising is there to be found the use of such a term as "7-teen." On the contrary, it is fully spelled out in its use by them. The telephone in their business office in St. Louis was listed in the directory as the "Seventeen Dress Co."
On January 5, 1945, defendants filed an application for a copyright as a trademark of "Seventeen for the Junior Teens" and on February 28, 1945, the application was denied by the Patent Office on the ground that it was descriptive of a size.
The defendants made no use of the name until in November 1944, three months after the first issue of the magazine, and then in connection with the display of their proposed line of dresses in New York, which were to be manufactured and delivered the following spring. In fact, none of defendants' dresses bearing the trade name "Seventeen for the Junior Teens" were delivered until in May 1945. A circular letter was sent on January 15, 1945, calling the attention of the trade to the new line and one ad was run in the Retailers Market News on May 19, 1945. In the letter and in the ad the trade name was used and the name was on the door of Hanson's headquarters in New York in November. Thus it will be seen that at the time the name came into any use whatsoever by the defendants, it had already been adopted and in use for several months by the plaintiff, and large sums of money had been expended in advertising it, and several issues of the magazine "Seventeen" had been placed upon the market.
The defendant Hanson and Mrs. Valentine, the editor-in-chief of the magazine, had a discussion on December 1, 1944, concerning *958 the entry by the defendants into the field of manufacturing junior teen dresses, and during the course of the conversation, the use by the defendants of the name "Seventeen for the Junior Teens" arose, and when asked by Mrs. Valentine why he had chosen that name, he said: "Well, Mrs. Valentine, I selected the name Seventeen because I believed it typified the very type of customers that I am catering to. And I said to her `Why did you select the name?' And she inferred practically the same thing." "She said that she was catering to exactly the same type of customer that I was."
From the evidence it must be determined that at the time the defendants selected the name "Seventeen for the Junior Teens" as a trade name for their line of dresses, they knew that the name "Seventeen" had been selected by the plaintiff as a name for its magazine, which was to be devoted to the advertising of junior teen dresses and other apparel for girls. Paraphrasing the statement of a distinguished jurist, one cannot escape the conclusion that the defendants were overcome by the sight of a well built, gassed, oiled and chauffeured vehicle ready to go, and could not refrain from attempting a free commercial "ride" upon it.
Before any dresses had been manufactured and delivered by the defendants, they had been notified by the plaintiff that they would be held to legal accountability if they attempted to use the trademark of the plaintiff as a trade name in the manufacture of their dresses, and they elected to stand upon their conclusion that they had a right to the use of the name.
There can be no property rights in a trademark as such.
"The mere fact that one person has adopted and used a trademark on his goods does not prevent the adoption and use of the same trademark by others on articles of a different description. There is no property in the trademark apart from the business or trade in connection with which it is employed. At law trademark is but a part of the broader law of unfair competition, the general purpose of which is to prevent one person from passing off his goods or his business as the goods or business of another." Citing United Drug Co. v. Rectanus Co., 1918, 248 U.S. 90-97, 39 S. Ct. 48, 63 L.Ed. 141. Hanover Star Milling Co. v. Metcalf, 240 U.S. XXX-XX-XX, 36 S.Ct. 357, 60 L.Ed. 713.
Ordinarily there can be no infringement and no unfair competition or unfair trade practice as between the publisher of a magazine and the manufacturer of women's clothing. Definitely they are not of the same descriptive properties. However, the evidence in this case shows an unusual condition and a striking similarity between some phases of plaintiff's business and that of the defendants.
In addition to the ordinary functions incident to the publication and circulation of a magazine such as plaintiff publishes, it also has a sales promotion policy designed to promote the sale of dresses which have been advertised in its magazine. In that connection it has experts in styles and salesmanship who go to the department stores offering for sale dresses which have been advertised in "Seventeen" to assist in formulating sales promotion plans for the sale of such dresses. For a consideration it supplies its advertisers with various types of advertising, such as cuts of dresses or garments which have been advertised in its columns. Such cuts may be blown up to many times their normal size, and so designed as to be set upon the floor in the department in which such merchandise is offered for sale. Usually such advertising carries the bold statement "You saw this advertised in `Seventeen'" or, "You saw this in Seventeen." The word "Seventeen" spelled out, is always most prominently emphasized throughout all of such advertising, as well as the number "17" appearing at various places upon the advertising.
Defendants sell their dresses to merchants, department stores and ready-to-wear stores that have also purchased and display dresses of like style, price and quality from other manufacturers who have advertised such dresses in "Seventeen." In the dresses manufactured by defendants, there is placed their trade name "Seventeen for the Junior Teens" emphasizing the word *959 "Seventeen." Defendants supply "hang tags"small pasteboard cards 1½ × 2½ inches, upon which appears their trade name; these tags are attached to the garments.
Plaintiff likewise supplies, for a consideration, "hang tags" to be attached to garments which have been advertised in "Seventeen," and call attention of the public to that fact. The editor testified that more than one million of these "hang tags" had been sold to merchants.
Under these competitive conditions, dresses made by defendants, and dresses made by other manufacturers are displayed by retailers. Each group has emphasized the word "Seventeen." Under such circumstances, it is very likely that persons interested in purchasing such dresses would be confused as to whether defendants' dresses had actually been advertised in "Seventeen." It seems likely also that such persons would also assume that the sale of defendants' dresses is sponsored by the magazine "Seventeen." One group of dresses has been advertised in the magazine at the rate of $1800 per pagethe other group gets the benefit and pays nothing.
In this field the businesses of plaintiff and defendants are of the same "descriptive properties." This case is somewhat comparable to the case of Esquire, Inc. v. Esquire Bar, D.C., 37 F.Supp. 875, 876. In granting an injunction against the defendants, the court said:
"That which strikes me most strongly about this case is the fact that the defendant, right in the beginning, not only adopted the name `Esquire', but adopted the method and means of conveying to the public the thought that the name `Esquire' was connected and identified with the signs and symbols and illustrations so peculiarly belonging to the plaintiff. * * * We do not have here a case where an alleged infringer has voluntarily and normally developed in a certain locality the use of a name, with no secondary meaning, but the defendant has deliberately assumed to use this name and by its method of adoption is shown to have chosen the name `Esquire' because the plaintiff had developed it with a secondary meaning. This wrongful adoption and use in its incipiency cannot now be viewed as innocent. * * *"
The recent case of Atlas Diesel Engine Corp. v. Atlas Diesel School, D.C., 60 F. Supp. 429, 431, decided by Judge Hulen on May 4, 1945, was a case in which the defendant, a school devoted to instruction of individuals with respect to construction and operation of Diesel engines, was sought to be enjoined by the Atlas Diesel Engine Corporation, the manufacturer of Diesel engines. In granting the injunction, Judge Hulen stated:
"The defendant's corporate name, because it includes the word `Atlas' in connection with the word `Diesel' is so confusingly similar to that of the plaintiffs that a confusion as to identity between plaintiffs and defendant, their activity, advertising, and services will result. Such confusion of identities will have the effect of destroying the good will and reputation heretofore established by the plaintiffs; and such confusion of identities will result in Diesel engine owners and operators and others interested in Diesel engines being led to believe that the graduate students of defendant were trained by plaintiffs. * * *"
The court further stated at loc.cit. 431:
"The law of unfair competition as applied to this case has for its purpose the prevention of a person from passing off his business as the business of another. Standard Oil Co. of New Mexico v. Standard Oil Co. of California, 10 Cir., 56 F.2d 973."
In determining this question the phrase "merchandise of the same descriptive properties" as used in the statute should receive a liberal construction. L. E. Waterman Co. v. Gordon, 2 Cir., 1934, 72 F.2d 272; Del Monte Special Food Co. v. California Packing Corp., 9 Cir., 1929, 34 F.2d. 774; General Shoe Corp. v. Forstner Chain Corp., C.C.P.A., 1940, 113 F.2d 127; Prouty v. National Broadcasting Co., D.C.D.Mass., 1939, 26 F.Supp. 265; Atlas Diesel Engine Corp. v. Atlas Diesel School, D.C.E.D.Mo., 1945, 60 F.Supp. 429.
There is no evidence of any attempt at misrepresentation or to confuse the public by either the defendants or by *960 the retailers of their products. Such showing is not necessary. As was said in United Drug Co. v. Obear-Nester Glass Co., 8 Cir., 1940, 111 F.2d 997, 1000:
"It is next asserted that there is no evidence of actual confusion. This is of no moment. It is sufficient if the proof shows that purchasers are likely to be deceived or confused."
See also Williamson Corset & Brace Co. v. Western Corset Co., 70 Mo.App. XXX-XX-XX; Tiffany & Co. v. Tiffany Productions, 1933, 262 N.Y. 482, 188 N.E. 30 Id., 1932, 147 Misc. 679, 264 N.Y.S. 459; Esso, Inc., v. Standard Oil Co., 8 Cir., 98 F.2d 1, 5-6; Esquire, Inc. v. Esquire Bar, D.C., 37 F.Supp. 875.
Very frequently the dresses and other articles of wearing apparel advertised by the manufacturers in "Seventeen" are in turn advertised in the newspapers by the department stores and the ready-to-wear stores, by which they have been purchased. In a great many instances the advertisements by the retailers in newspapers are quite similar to the advertisement of the same garments advertised in "Seventeen."
In view of all the foregoing, it is my conclusion that defendants have been guilty of unfair trade practices and unfair competition in the use of the trade name "Seventeen for the Junior Teens" and that they should be enjoined in its further use.
Defendants raise the question that the name "Seventeen," prior to its adoption by the plaintiff, was selected and adopted by others engaged in the manufacture of cosmetics and other products. There is no question before the court as to any objection on the part of any other person, or as to any competition as between such products and the magazine "Seventeen" or any evidence as to the similarity of general descriptive properties of the products. It is therefore not necessary to discuss those matters.
Both parties seem to have enjoyed unusual and unexpected success, particularly in view of the economic conditions prevailing at the time each business was organized.
There is no evidence that plaintiff has sustained any loss. An accounting is denied. Defendants' counterclaim is dismissed. Plaintiff is entitled to permanent injunctive relief enjoining defendants from the further use in any manner whatsoever of the word "Seventeen" in the manufacture, sale, distribution and advertising of their dresses, and to recover its costs. Findings of Fact, Conclusions of Law and Judgment may be submitted.
It is so ordered.
NOTES
[1] "October 9, 1944
 "Mr. Charles Sonnenreich
 "1501 Broadway
 "New York, New York

"Individual here organized junior dress company named Seventeen desires register mark. Search if registered for dresses. New magazine using same name is mark registered. Would this conflict with dress business.
"Day Letter Samuel C. Klein
"Charge our Mary Muffet Account"