**EMBA MINK BREEDERS ASSOCIATION, a corporation, Plaintiff,**

v.

**UNITED MINK PRODUCERS ASSOCIATION, a corporation, Defendant.**

**Civ. A. No. 3681.**

United States District Court W. D. Wisconsin.

Dec. 20, 1963.

Joseph G. Werner, Madison, Wis., Oliver P. Howes, Jr., Walter J. Halliday and Thomas A. Kain, New York City, of counsel for plaintiff.

John C. Wickhem, Janesville, Wis., Edward A. Haight and John W. Hofeldt, Chicago, Ill., of counsel, for defendant.

GRUBB, District Judge.

On plaintiff's motion for preliminary injunction.

This is an action for trademark infringement and a related claim for unfair competition under the trademark laws of the United States, Title 15 U.S.C.A. § 1051 et seq., and under Title 28 U.S.C.A. § 1338. The verified complaint, affidavits submitted by the parties, and testimony offered on the hearing were considered in connection with this motion.

Plaintiff, Emba Mink Breeders Association, is a Wisconsin nonprofit cooperative corporation, organized in 1942 under the name of Silverblue Platinum Mink Association. It changed its name to Mutation Mink Breeders Association in 1945, and to Emba Mink Breeders Association in 1961. Defendant, United Mink Producers Association, is a nonprofit cooperative Wisconsin corporation organized in 1938. Both parties are associations of mink farmers or ranchers and provide services to their members in the promotion of their interests in production and marketing of mink pelts. Many ranchers belong to both associations.

Plaintiff began use of the trademark EMBA in connection with mink pelts in 1948 and thereafter obtained federal registration No. 613,699 thereon in October 1955. The mark represents a phonetic adaptation of the first letters of the words of plaintiff's former corporate name, Mutation Mink Breeders Association. Defendant adopted its mark UMPA in connection with mink pelts in 1932 and obtained federal registration No. 586,989 thereon in March 1954. The mark combines the initial letters of defendant's corporate name.

The respective registered marks are collective marks under Section 1054, Title 15 U.S.C.A., that are used by members of an association to identify the source of the goods as being in the members of said association. The marks are stamped on the mink pelts produced by the members of the parties which thereafter grade, select, and supervise the sale thereof.

Since its incorporation, plaintiff has aided and protected the interests of its members in the production and marketing of mutation mink pelts. The term "mutation mink pelt" as used in the trade designates a pelt of biologically derived shades of colors, ranging from white to black, resulting from selective breeding of animals of genetically determined ancestry. In the trade, pelts of all shades of colors except those known as dark ranch mink are designated as mutation mink pelts. Color variations have resulted from outcroppings of dark-colored mink. A substantial portion of the development of color variations has taken place on ranches of persons who are members of the defendant and of the plaintiff.

Plaintiff's mark EMBA has been used exclusively on mutation mink pelts. It has expended approximately $3,000,000 in the promotion of its mark EMBA in connection with mutation mink pelts produced by its members and of garments made therefrom. Plaintiff distributes labels bearing its mark EMBA to certain manufacturers for use on full skin garments made entirely from EMBA stamped pelts, and controls the use of such labels by a limited licensing agreement. The marks stamped on the pelts usually are hidden by the lining of the finished garment.

Prior to the fall of 1963, defendant promoted the production and sale of dark ranch mink pelts, and the mark UMPA was used on and in connection with such pelts only. From 1945 to date, defendant has expended almost $800,000 in advertising and promotion of its mark UMPA and additional sums to publicize the mark by retail establishments cooperating with defendant in advertising featuring said mark in connection with fur garments. Advertising by both parties has been to the trade and to the ultimate purchasing public.

Sales of mink pelts are through the auspices of auction houses. In the past plaintiff and defendant have been assigned separate sales dates. Mutation mink pelts have been sold tanned in a dressed state; that is, fur side out, while dark ranch mink pelts have been sold in the raw or untanned state with the pelt side showing. Purchasers of mink pelts are brokers or fur garment manufacturers who may sell such garments at wholesale or at retail to the consuming public.

Registration of the mark EMBA was for use in conjunction with the commodity "mink fur pelts," and in the case of the mark UMPA, for "fur pelts." Affidavits filed under the Trademark Act as of February 1960, as to the mark UMPA, claim use on "fur pelts" and illustrate the use of the mark on a label bearing the mark UMPA and the phrase "World's Finest Dark Ranch Mink." The claimed use as to the mark EMBA as of March 1961 was in connection with "mink fur pelts," and the illustrative sample shows another tradesmark "Lutetia" as the brand and carries the mark EMBA and the description "Natural Gunmetal Mutation Mink."

In September 1963, defendant announced to the trade that its mark UMPA

would be used in connection with mutation mink pelts in the selling season of 1964. Since that time, defendant and its members individually have advertised the mark UMPA in trade publications in connection with mutation mink pelts and have expressed their intention to advertise it in general circulation magazines in connection with the retail sale of garments made of mutation mink pelts.

Plaintiff contends that the present and proposed use of the mark UMPA in connection with the promotion and sale of mutation mink pelts or garments made therefrom constitutes infringement of its mark EMBA and acts of unfair competition in that it would deceive the public and lead it to believe that mutation mink pelts bearing the mark UMPA had their source in plaintiff's membership. Although defendant's mark UMPA was used and registered before the mark EMBA in connection with mink pelts, plaintiff claims that mutation mink pelts constitute a class of goods distinct from that of dark ranch mink pelts. As to the claimed commodity of mutation mink pelts; that is, any shade of pelt other than dark ranch mink, plaintiff contends that its mark EMBA enjoys superior rights because said mark EMBA was used with mutation mink pelts before defendant's mark UMPA was so used. Plaintiff further claims that the marks EMBA and UMPA are confusingly similar and that concurrent use of said marks on mutation mink pelts would tend to deceive the purchasers of the pelts as well as the ultimate purchasers of mink garments who rely on the name EMBA as a source of high quality mutation mink.

In obtaining and keeping alive their respective trademark registrations, the parties to this suit did not recognize a distinction between mutation mink pelts and dark ranch mink pelts. Illustrative samples of uses of the mark submitted to the patent office are not conclusive limitations as to the classification of the commodity. The logical consequence of plaintiff's contention as to the effect of these samples would restrict plaintiff's mark EMBA to the mutation described as "gunmetal" on the label. The differences between the products, such as the genetic background of the animal from which the pelt is obtained, the color of the fur and condition of the pelt on marketing, weighed against the similarity in production, manner of marketing by auction, and ultimate sale and use, do not support a finding that all mutation mink pelts ranging in color from white to black constitute a class distinct from that of dark ranch mink pelts of a brown color. Cf. France Milling Co. v. Washburn-Crosby Co., 7 F.2d 304 (2d Cir. 1925), and Dwinell-Wright Co. v. National Fruit Product Co., 140 F.2d 618 (1st Cir. 1944), where the products in question had distinct differences in content and even more pronounced differences in use. There has been no showing here that the claimed distinction was one that was followed by the trade generally or that it has been observed in other trademark registrations in the class of goods.

The marks EMBA and UMPA, at first glance, display a marked similarity. It does not follow that the apparent likeness would cause confusion among the purchasers of the pelts or among purchasers of finished mink fur garments. On the showing made, the court cannot find that the immediate buyers; that is, manufacturers or their brokers, being familiar with both parties, their activities in marketing pelts, and with their trademarks, would be confused.

The ultimate consumer, the buyer of a mink pelt garment, makes his or her purchase with the assistance and advice of sales personnel who may be especially trained with respect to this merchandise. It is not claimed that the sales persons would be confused as to the source of goods bearing the mark EMBA or UMPA. The evidence of record as to consumer consciousness of the mark EMBA as a source of quality mutation mink does not establish a probability of confusion under the circumstances of the sale of fur coats or other mink wearing apparel bearing the parties' trademarks. Nor does it

establish that the consumer knows whether any particular shade of mink is to be classified as dark ranch mink or as mutation mink identified as to source by the mark EMBA. The category of mutation mink pelts, as the term is known in the trade or understood by plaintiff, does not present as clear a concept to the public as would pancake flour or tea and coffee, deemed to constitute distinct classifications of goods as against wheat flour and fruit juices, respectively, in the France Milling Co. and Dwinell-Wright Co. cases, supra. Deception of the public cannot be determined by mere comparison of the marks. It also depends on the totality of circumstances under which the public is exposed thereto.

The quality of mink pelts heretofore marketed under the mark UMPA is at least equal to that of pelts bearing the mark EMBA. No facts were shown to support a finding that use of the mark UMPA on mutation mink pelts would injure the good will or reputation adhering the mark EMBA because of use on pelts of inferior quality. If defendant's proposed use of its mark UMPA in connection with mutation mink pelts were ultimately found to be wrongful, plaintiff's injury, at least on the record on this motion, would lie principally in loss of income derived from percentage of sales prices of mutation mink pelts which members of defendant would have marketed through plaintiff rather than through UMPA or independently. The amount of loss cannot be estimated at this time but would be susceptible of determination in money damages in the event plaintiff should prevail in this action.

The showing on this motion in respect to a superior right of plaintiff's mark over that of the defendant, as to likelihood of confusion and as to irreparable harm is insufficient to warrant the drastic remedy of restraining defendant's proposed use of its mark UMPA in connection with the promotion and sale of mutation mink pelts. For this reason plaintiff's motion for preliminary injunction must be and it is hereby denied.

The foregoing opinion incorporates the court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S. C.A.