### I. T. S. CO. v. TEE PEE RUBBER CO.

(Circuit Court of Appeals, Sixth Circuit. April 5, 1923.)

No. 3804.

1. **Patents ⬅⮞328—Reissue 14,049, for rubber heel lift, held not infringed.**
   The Tufford reissue patent, No. 14,049, for a rubber heel lift, *held* not infringed.

2. **Trade-marks and trade-names and unfair competition ⬅⮞98—Accounting for unfair competition will not be ordered when there could be no substantial recovery.**
   While, on a finding of unfair competition, an inquiry into profits made or damages caused normally follows, an accounting will not be ordered, where it is clear that there could be no substantial recovery.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Suit in equity by the I. T. S. Company against the Tee Pee Rubber Company. From the decree, complainant appeals. Affirmed.

Charles A. Brown, of Chicago, Ill., and F. O. Richey, of Cleveland, Ohio, for appellant.

Frederick P. Fish, of Boston, Mass., and C. P. Goepel, of New York City, for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. This case is in effect a suit for infringement and unfair competition brought by the I. T. S. Company against the Tee Pee Company; the infringement charged being based upon the Tufford reissued patent No. 14,049 for rubber lifts for shoe heels. The District Court granted a preliminary injunction, but on appeal this order was reversed. Tee Pee Co. v. I. T. S. Co. (C. C. A.) 268 Fed. 250. The case then went to final hearing upon proofs taken in open court. The District Judge thought that the question of patent infringement was controlled by the former decision of this court, and accordingly held that the T. P. lift did not infringe the Tufford patent. He also found the existence of a measure of unfair competition, and awarded an injunction on that issue, but declined to order an account-

---

⬅⮞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ing of profits or damages. On this appeal the I. T. S. Co. insists upon the existence of infringement and upon its right to have an accounting.

[1] Upon the issue of infringement, the controlling questions are precisely the same as those which were fully considered and decided upon the former appeal, and as to which the Circuit Court of Appeals of the Seventh Circuit, on appeal from an interlocutory injunction, has reached the same conclusion. U. S. Rubber Co. v. I. T. S. Co., 288 Fed. 786. We have carefully considered the very earnest and emphatic contentions of counsel, intended to demonstrate that our former conclusion was wrong, but we are not convinced; on the contrary, further study confirms the results then reached.

The present record contains some further experiments, and some further testimony as to experiments and as to opinion, not found in the former record; but nothing that seems to us persuasive. With this conclusion, the decree might be affirmed upon the former opinion; but perhaps the contentions of appellant's counsel are fairly entitled to some discussion. They are in effect—and coming to the vital point at once—that, in former structures, the center of the breast edge was the weak spot because of its tendency to be open; that the Tufford lift, by virtue of the functions inherent in the structure claimed, produced an intensive sealing of the breast edge up against the bottom of the heel, at the center as well as all the way across, and thus excluded water; that this result follows only indirectly from the flattening of the upper concave surface up against the heel, but comes directly from the tendency to "unflatten"—that is, of the distorted rubber to return to its original shape; that the greater the distortion the greater the pressure or thrust to return; that in the progress of flattening the T. P. lift, by nailing, the breast edge even at the center comes up against the heel in advance of any contact between the heel and the lift a little back from the edge, say an inch or half an inch, is therefore, as the flattening is finished, somewhat more distorted, and therefore has a more intensive upward thrust and sealing effect than has the body of the lift a little back from the edge. In other words, it is said that though the T. P. lift as it is first placed up against the heel, may have no low spot centrally located as in the Tufford heel, yet that, as the process of attaching is continued, this low spot develops somewhere out toward the breast edge, the lift then responds to the claim, and the remainder of the attaching process and the resulting breast edge sealing are according to the theory of the Tufford patent as we have construed it. We have no occasion to deny that infringement could be spelled out in this way if the orthography were correct; but we are convinced that the T. P. lift does not perform in this way to any substantial degree, in theory or in practice.

First, considering theory: We think confusion comes from thinking alone of the center longitudinal line of the upper face that is shown on page 251 of 268 Fed. It is obviously true that if this line only were involved, and it were pivoted at its higher end, it would, in the process of attachment, swing up until its forward end touched the heel, and then, as the center part was flattened, this forward end would

thrust upwardly and seal; but this ideal line cannot be thought of by itself.[1] The just recited performance does not happen. Points in the line do not swing up in the arc of a circle. The central line is tied to the remainder of the lift and when the points in it are forced up, they move vertically. The critical point at the center of the breast edge is not only the free end of the supposed longitudinal arch, which by itself might have some tendency to an upward thrust, but it is also the center or key point of the transverse arch, and any tendency of this point to be thrust upward by the flattening of the longitudinal arch toward its center is resisted, and perhaps more than counterbalanced, by the effort of the transverse arch to maintain its former shape. Which force would prevail must depend upon the many varying elements, such as the respective depth of the arches in proportion to their length, the thickness of the lift at its various parts, the extent and character of the resiliency, etc. It would seem that the T. P. transverse arch is enough sharper than the longitudinal arch, so that the net tendency would be for the breast to remain open at this critical point; certainly nothing in the theories involved assures the contrary result; and that this is what does happen is demonstrated by the exhibits, which show that when the center of the T. P. lift is driven up completely against the heel, the breast is still open. As the attaching proceeds by driving in further nails between the center and the breast edge, there seems no sufficient reason for thinking that there is any point where this balance between the thrust and the resistance should shift so that the breast edge would come into contact before the driving point does.[2] The theoretical problem is complicated by other elements; but if possibly there is such a tendency in the edge to make contact first, it is so slight and unsubstantial as to be only the shadow and not the substance of the Tufford operative theory.

Coming to practice: Exhibits are produced consisting of lifts nailed onto boards, which are said to show equivalent results with the I. T. S. and the T. P. heels, while at the same time illustrating the failure of the Nerger to maintain a tight edge. All such exhibits must be looked at critically, and no visual impression accepted hastily. The extent and manner of nailing are important. Each nail passes through a washer which is embedded in the rubber. The nail head is stopped by the washer, but, if the driving is continued, the rubber between the washer and the heel is compressed and this compression has an effect

[1] If it could be, Nerger would show the same operation. Both ends of a longitudinal (irregular) arch would be in contact with the heel before the flattening began.

[2] Appellant's expert declares that the resistance of the sharper transverse arch will be overcome by the power necessary to depress the flatter longitudinal arch; but this conclusion can hardly be accepted. His assertion that the distortion problems are the same in the I. T. S. and T. P. lifts is based on the theory that the transverse arch at the breast of the I. T. S. is, like that in the T. P., sharper than the transverse arch in the middle. This is a mistake, and his supposed demonstration with the lift applied to a globe would prove the contrary, if the lift were turned around. Perhaps it was overlooked that the strength of an arch, which is an arc of a circle, depends not alone upon the radius of the circle, but also upon the extent of the segment taken.

upon the surrounding rubber, depending upon the unknown size of the washer and the extent of the compression. Nerger's heels have only two nails which are on the longitudinal center line. Nerger's edges in these exhibits are for this and perhaps other reasons not well sealed Tufford's theory teaches that his edges would seal; but he does not depend on Nerger's two nails. He puts in five more, following the shape of the edge and approximately midway between the center and the edge. When we compare the sample exhibits showing the I. T. S. and the T. P. heels, we find that the nails are much nearer the breast edge and corners in the T. P. than in the corresponding size of the I. T. S. There is nothing in these exhibits to convince that the T. P. has any substantially better breast edge seal than Nerger would have if he used the same quality of rubber, the same sized washers located the same distance from the upper face, and the same number of nails located as near the edge. Indeed, a comparison of plaintiff's Exhibit K K and Defendant's Exhibit 23, shows that if the T. P. lift on the board K K, which is nailed only at the very center, is pressed, as if by nailing, at the nail hole nearest the breast center, the edge will close there but will be open on both sides of the center just like the Nerger lift on 23, while if the latter is pressed, as if by nailing, at the corner points corresponding to the T. P. nailing, it will be completely edge sealed, apparently just as well as the completely nailed T. P. on the same board.

Manifestly, as stated in the former opinion, even a flat heel will seal fairly well at the edge, if the compression made by the nail head and washer is of the right degree and is near enough to the edge, although of course, the distortion would be less than at the point of driving. It should not be overlooked that a change in angle of driving, as the nail passes from the lift into the heel, will produce distinct effect upon the edge seal. These board exhibits strongly suggest that the breast edge sealing of the T. P. is due to breast edge nailing rather than to its shape.

The so-called suction test is not controlling, nor highly persuasive, as we pointed out in the former opinion. On this record it must be assumed that a substantial number of T. P. lifts can be made to adhere to glass by expelling all the air from the concavity; others cannot. We assume also that a flat heel cannot be made to adhere, although, if this is true, it seemingly must be because of the physical qualities of the rubber with which the experiment has been tried. In these cases of adherence there is a zone of compression on the breast edge, visible through the glass; but this does not demonstrate that the Tufford longitudinal arch is present with the Tufford function. The edge compression exists, we think, not because the T. P. has adopted the Tufford shape, but in spite of its absence; and it may well be that after the air has been all excluded by perfect flattening, the atmosphere will hold the edges tight while the center springs a little away. Other plausible theories to explain the phenomenon suggest themselves. They are interesting but not controlling. The shape to which Tufford limited himself in order to avoid Nerger is not present.

It is also said that some of the T. P. heels in evidence do have the low spots, indicating the Tufford function. This was not mentioned

by any witness, nor in any way brought to the attention of the court below, save by comment upon an exhibit made after the court announced its conclusion. This particular exhibit seems to show two lifts having this form in slight degree. A probable explanation is that it is due to the accidental distortion of some specimens in cooling. It cannot be commercially important, in view of the fact that its existence was not discovered by counsel for the patent in the former hearings below or in this court, or in the present hearing below, except as stated.

It follows that, in so far as the decree finds no infringement of the Tufford patent, it must be affirmed.

[2] In patent, trade-mark, and copyright cases, where the court finds a past infringement of plaintiff's exclusive right and awards an injunction, an inquiry into the profits made or damages caused by the defendant will normally follow. The same rule of presumption may well apply to an unfair competition case (Merriam Co. v. Saalfield [C. C. A. 6] 198 Fed. 369, 371, 117 C. C. A. 245), although the reason therefor will be of less imperative character than in cases where a more definite and positive right has been infringed; but even in these more definite cases, the rule that there should be an accounting for past actions has its exceptions, and an accounting will not be ordered where it is clear that there could be no substantial recovery (Ludington v. Leonard [C. C. A. 2] 127 Fed. 155, 157, 62 C. C. A. 269; Merriam v. Ogilvie [C. C. A. 1] 170 Fed. 167, 169, 95 C. C. A. 423; Gaines v. Rock Spring Co. [C. C. A. 6] 226 Fed. 531, 543, 141 C. C. A. 287—reversed by the Supreme Court, but not on this point).

We think the present case, with relation to the acts of competition adjudged unfair, belongs in the exceptional class. Each pair of rubber lifts was put up in a paper box, with different colors and markings, indicating the colors and sizes of the lifts. The boxes first adopted by the T. P. Co., and used until complaint was made, were sufficiently similar to tend to mislead an ordinary purchaser over the counter; hence the injunction was proper; but we agree that it went as far as the proofs justified. However, very few sales were made in this way; the ordinary ultimate consumer was the cobbler or other professional shoe repairer, who would buy a considerable number of boxes, and who would usually understand their origin. The probability that any proof exists that any substantial number of sales had been made because of any such misleading dress seems very remote; and, lacking proof or presumption that the sale itself had been caused by the wrongful act, it would seem impossible to apportion any profits to the use of this package as distinguished from rightful profits on the goods themselves; nor are we aware of any principle upon which all the profits could be awarded. Straus v. Notaseme Co., 240 U. S. 179, 182, 36 Sup. Ct. 288, 60 L. Ed. 590. The sale of the article itself was lawful; the misleading inducement must have been a minor fraction in distributing the causes of sale; the case is not parallel to one where the name of the thing would be dominant in advertising and in sales.

We think that the appellant cannot complain of the denial of accounting, and that the decree in this respect also should be affirmed.