**HANSON et al. v. TRIANGLE PUBLICATIONS, Inc.**

**TRIANGLE PUBLICATIONS, Inc., v. HANSON et al.**

Nos. 13463, 13464.

Circuit Court of Appeals, Eighth Circuit.

Aug. 15, 1947.

Rehearing Denied Sept. 17, 1947.

WOODROUGH, Circuit Judge, dissenting.

———————◆———————

George T. Priest and Aubrey B. Hamilton, both of St. Louis, Mo. (Howard Elliott, of St. Louis, Mo., on the brief), for Gilbert E. R. Hanson and Joseph Schwartz.

Richardson Dilworth, of Philadelphia, Pa., and Samuel H. Liberman, of St. Louis.

Mo. (Harold E. Kohn, of Philadelphia, Pa., William R. Bascom, of St. Louis, Mo., Murdoch, Paxson, Kalish & Dilworth, of Philadelphia, Pa., and Shepley, Kroeger, Fisse & Ingamells, of St. Louis, Mo., on the brief), for Triangle Publications, Inc.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The action is one for trade-mark infringement and unfair competition. The trial court granted an injunction, on both grounds apparently, but denied any recovery of profits or damages. Both parties have appealed. The opinion of the trial court appears in D.C., 65 F.Supp. 952.

The plaintiff, Triangle Publications, Inc., is the publisher of "Seventeen," a magazine of fashions and other interests for girls of high school age. It began publication of the magazine in August 1944 and had the name "Seventeen" registered in the Patent Office as a trade-mark for "a monthly magazine devoted to the interests of girls."

The defendants, Hanson and Schwartz, as partners, are manufacturers of dresses for "teen-age" girls, named and labeled "Seventeen for the Junior Teens." They began to show styles and samples to the trade in November 1944 but did not make deliveries until May 1945. The complaint in the present action was filed in March 1945.

Infringement and unfair competition are claimed from defendants' use of the word "Seventeen" in their trade name and label of "Seventeen for the Junior Teens." The word "Seventeen" is given prominence by defendants over the words "for the Junior Teens" in their insignia. Plaintiff charges that defendants are appropriating its registration and also the acquired secondary meaning of its trade-mark; that the magazine's relation to the field of teen-age apparel is such that by defendants' use of the word "Seventeen" the public will be led to believe that defendants' dresses have been advertised in or otherwise endorsed or sponsored by the magazine; and that defendants are simply trying to get a free ride for their products on the trade-mark and good will of the magazine.

From the findings and the evidence, the magazine "Seventeen" had had a phenomenal and instant success and had become from the time of its first publication a recognized and outstanding fashion magazine for teen-age girls. Substantial promotional efforts to establish this position had been engaged in both before and in the months immediately following its appearance. Its initial number consisted of 380,000 copies and its circulation rapidly increased. By December 1945, 750,000 copies of the magazine were being published. Its advertising rates also correspondingly rose. Its original rate had been $750 per page, but by May 1945 this was increased to $1200 and by January 1946 to $1800.

As part of its business scheme, the magazine began immediately to sell reprints, counter cards and "blow-ups" of its advertisements and style comments for use in store displays. It sold hang-tags for garments on sales racks, featuring the words "You saw it in Seventeen." Up to the time of the trial, over a million such hang-tags had been sold. From the start, it also offered a suggestion service to retail stores for their department set-ups and window displays of teen-age apparel, and it assisted them in putting on local fashion shows featuring garments that were advertised in its columns. Its appeal and prestige were such that more than a hundred manufacturers and merchandisers had sought permission to use the name "Seventeen" for their products or to associate their products with the magazine. The magazine has consistently refused to consent to the use of its name for any product.

The trial court made findings that defendants had deliberately chosen the word "Seventeen" as part of the trade name for their dresses, with knowledge of the reputation which the magazine had at that time acquired by virtue of the instant favor which it had won among girls of high school age, and with the object of appealing to the group reached by the magazine; that defendants were seeking to trade on and take unfair advantage of the magazine's fame, reputation and good will; that, while the evidence did not show that defendants or the dealers in their products had been

guilty of any direct misrepresenting and confusing, and while defendants had been careful not to state specifically that their dresses had any connection with the magazine, they nevertheless had sought in various ways to foster such an impression, as, for example, by furnishing dealers with hang-tags, such as the magazine did, in which the word "Seventeen" was emphasized; that persons in the fashion and apparel business had been confused by defendants' trade name into believing that there was some relation between their dresses and the magazine; and that defendants' further use of the word "Seventeen" as part of their trade name and label was likely to confuse the public by causing it to believe that defendants' dresses were advertised in or were sponsored, approved or endorsed by the magazine. There is evidence supportive of these findings.

The injunction entered prohibited defendants from using in any manner whatsoever the word "Seventeen," or the numeral "17," or any name including the word "Seventeen," in the manufacture, sale, distribution or advertising of dresses or other wearing apparel for girls.

One of defendants' contentions here is that plaintiff's trade-mark is invalid. But as a name for a magazine catering to girls from 13 to 18 years of age, we agree with the trial court that "Seventeen" is a fanciful or suggestive term rather than a commercially descriptive one. Its value in its registered use would seem to lie in its symbolic appeal and not in any indication of particular product. Cf. San Francisco Ass'n for the Blind v. Industrial Aid for the Blind, 8 Cir., 152 F.2d 532, 533, 534. It can hardly be said, within the language of the Trade-Mark Act of 1905, as amended, to be "merely * * * descriptive of the goods with which they are used, or of the character or quality of such goods." 15 U.S.C.A. § 85. It is not in our opinion such a summary or characterization of contents as was held to be made by the title "Aviation" in McGraw-Hill Pub. Co. v. American Aviation Associates, 73 App.D.C. 131, 117 F.2d 293; "Ranch Romances" in Warner Publication v. Popular Publications, 2 Cir., 87 F.2d 913; "College Humor" in Collegiate World Pub. Co. v. Du Pont Pub. Co., D.C., N.D.Ill., 14 F.2d 158; and other similar cases upon which defendants rely.

Defendants further contend that their use of "Seventeen" as a name for dresses is not an infringement under the Trade-Mark Act of plaintiff's registration of the term for a magazine title. Infringement under the statute involves the use of a trade-mark upon "merchandise of substantially the same descriptive properties as those set forth in the registration." 15 U.S.C.A. § 96. It must be conceded that magazines and dresses would not normally be regarded as merchandise of substantially the same descriptive properties. There is, however, the factor to be considered that plaintiff has made its magazine serve also as a commercial blesser and oblique brander of merchandise for identifying the products of its advertisers in the market.

But this promotive use of the name of the magazine in a service for commercially blessing and obliquely branding the merchandise of others, as a medium for identifying and stimulating the sale thereof and with its special business incidents to plaintiff of selling hang-tags, reprints, counter cards, "blow-ups", etc., would seem not to be directly within the scope of plaintiff's registration and to constitute rather an extension of the trade-mark into a field of outside or secondary meaning. Such a secondary meaning, however, also is entitled to protection from unfair competition, and this ground of itself would require affirmance of the injunction here, even though there has been no technical infringement of the statutory registration.

On the question of unfair competition, the trial court in substance found, and the evidence supports the finding, that plaintiff's use of the trade-mark "Seventeen" had acquired a secondary meaning indicative in the public mind of a relationship between the magazine and any girls' apparel on which or as to which the name was used, and that this secondary meaning had been acquired prior to the time that defendants began to use the name for their dresses. It also found, as heretofore indicated, that defendants had deliberately chosen the

word "Seventeen" as part of their trade name with knowledge of the reputation which the magazine had acquired and with the object of appealing to the group reached by the magazine, and that defendants were seeking to trade on and take unfair advantage of the magazine's fame, reputation and good will. The evidence further shows that plaintiff had protested against defendants' use of the name from the start, and, as previously stated, plaintiff instituted this suit for an injunction before defendants had begun to make deliveries of their dresses to the trade.

But defendants argue that what they have done cannot legally be termed unfair competition because their business is not competitive with that of plaintiff. Plaintiff admittedly is not engaged in the manufacturing of dresses. As has been emphasized, however, it is using the name of its magazine in a service for commercially blessing and obliquely branding such merchandise in the market as an identification. In this service aspect, which it has made an incident of its publication business, defendants' use of the word "Seventeen" as a vehicle for identifying and selling dresses would necessarily be competitive with plaintiff's use thereof for the same purpose through the lending of its name to the goods of its advertisers.

■ Going beyond this, however, there can be unfair competition although the businesses involved are not directly competitive. Under present general law, the use of another's mark or name, even in a noncompetitive field, where the object of the user is to trade on the other's reputation and good will, or where that necessarily will be the result, may constitute unfair competition. See e. g. Yale Electric Corporation v. Robertson, 2 Cir., 26 F.2d 972, 974; Del Monte Special Food Co. v. California Packing Corporation, 9 Cir., 34 F.2d 774; Atlas Diesel Engine Corp. v. Atlas Diesel School, D.C., E.D.Mo., 60 F.Supp. 429. This inherently would seem to imply— though the cases are not unanimous in their theory—such a reputation and good will in the circumstances as to make it likely that the public will be confused or deceived by the particular use. Under the rule stated, the finding here as to the reputation and good will of plaintiff's magazine, as to defendants' deliberate attempt to get a free ride on this standing, and as to the likelihood of public confusion from defendants' continued use of the name, clearly entitled the trial court to hold that defendants were guilty of unfair competition. Cf. Vogue Co. v. Thompson-Hudson Co., 6 Cir., 300 F. 509, 512; Esquire, Inc. v. Esquire Bar, D.C., S.D.Fla., 37 F.Supp. 875. There is the additional element in the situation, as found by the trial court, that persons in the fashion and apparel business had in fact been confused into believing that there was some relation between defendants' dresses and plaintiff's magazine.

Defendants contend that this general law, which the trial court applied, is not the law of Missouri, and that the case is governed by the law of that State. The argument is that in an unfair competition case in Missouri a federal court should apply the conflict of laws rule of that State; that the conflict of laws rule of Missouri requires that the law of the State where the wrong was done be applied; and that the wrong in the present case was done in Missouri, since this was the place where defendants' dresses were manufactured and placed in commerce. Plaintiff urges that the general law of the previously cited and other federal cases is controlling, since the unfair competition charge is pendent to a claim of trade-mark infringement, and that if this general law does not apply then the unfair competition law of New York governs, in that this is where the magazine is published and where most of plaintiff's advertisers have their places of business and hence should be regarded as the place where the wrong was done.

For purposes of this appeal, it is not important whether the trial court should have applied general law, New York law or Missouri law, for the result here we think would be the same. The general rule which the trial court applied also is the rule in New York. See e. g. Tiffany & Co. v. Tiffany Productions, 147 Misc. 679, 264 N.Y.S. 459, affirmed 237 App.Div. 801, 260 N.Y.S. 821, affirmed 262 N.Y. 482, 188 N.E. 30; Philadelphia Storage Battery Co. v. Mindlin, 163 Misc. 52, 296 N.Y.S. 176. And while we have found no Missouri case that

is determinative, it is our view that the same rule would be applied by the courts of that State. Thus, as an indication, in National Telephone Directory Co. v. Dawson Mfg. Co., 214 Mo.App. 683, 263 S.W. 483, 484, the court referred to the narrow and technical sense in which the term "unfair competition" had been used in the earlier English and American cases and made the following comment: "The doctrine as thus announced has since, by process of growth, been greatly expanded in its scope to encompass the schemes and inventions of the modern genius bent upon reaping where he has not sown."

■ Two contentions of defendants remain. One is that the terms of the injunction are "so broad, vague and indefinite as to be wholly incapable of judicial enforcement." This we think is so devoid of merit on its face as not to require discussion. Defendants can hardly have any real fear that they may be held in contempt for putting "17" in their dresses as an indication of size. The other contention is that the court was without jurisdiction to grant relief, because plaintiff's claim of trademark infringement was so plainly unsubstantial that the charge of unfair competition was cognizable only as a matter of jurisdiction for diversity of citizenship, and plaintiff failed to show that the necessary amount was involved to support such jurisdiction.

■ Under Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, 305 U.S. 315, 324, 325, 59 S.Ct. 191, 83 L. Ed. 195, and Hurn v. Oursler, 289 U.S. 238, 240-244, 53 S.Ct. 586, 77 L.Ed. 1148, as well as other cases, an allegation of infringement of a registered trade-mark, unless plainly unsubstantial, carries with it jurisdiction to determine an issue of unfair competition which is part of the general situation and not inherently a separate cause of action, even where the claim of infringement fails on the trial. See also L. E. Waterman Co. v. Gordon, 2 Cir., 72 F.2d 272, 274. The allegation of infringement here cannot be said to be plainly unsubstantial, as we think our previous discussion of the issue shows.

■ But if it had been necessary to rest jurisdiction on diversity of citizenship, it would have to be held that the evidence is sufficient to support the finding of the trial court that more than $3,000 was involved in the controversy. What plaintiff primarily was seeking to protect was its good will or the value of its right to use the name "Seventeen," and this aspect was one of the factors to be taken into account in a determination of the amount that was involved. See e. g. Beneficial Industrial Loan Corp. v. Kline, 8 Cir., 132 F.2d 520, 525; Indian Territory Oil & Gas Co. v. Indian Territory Illuminating Oil Co., 10 Cir., 95 F.2d 711, 713. Under the evidence, plaintiff had expended $150,000 in initially promoting its magazine. The magazine had attained an immediate and continued preeminence in its field. Its circulation had grown rapidly from an original 380,000 copies to 750,000 copies per month. Its advertising rates similarly had increased from $750 per page to $1200 and later to $1800. From the time the magazine began to be published, manufacturers and merchandisers had sought to obtain permission to use or connect its name with their products and over a hundred such requests had been received. From these and other facts in the record, the trial court could properly find that the amount involved was in excess of $3,000. Cf. also Del Monte Special Food Co. v. California Packing Corporation, 9 Cir., 34 F.2d 774, 776, 777.

■ On plaintiff's cross-appeal from the trial court's denial of any recovery of profits or damages, we repeat our previously indicated view that there was no technical infringement of plaintiff's statutory registration. Beyond this, there was a finding by the trial court that there was no evidence that plaintiff had sustained any loss either directly or indirectly, and this finding is controlling as to the unfair competition which is involved. Plaintiff appears to have been able to get all the advertising for its magazine that it could handle under the existing paper shortage. The evidence tends also to show that under the merchandise shortages of the war and postwar period the sale of defendants' dresses up to the time of the trial had not been depend-

ent upon the use of plaintiff's name. As the trial court pointed out, the success of both plaintiff and defendants in their respective fields was primarily due to economic conditions. 65 F.Supp. at page 960. There was no contention that there had been any damage to the magazine's reputation and good will from the quality or style of defendants' merchandise. Any possibility of damage to plaintiff's reputation and good will was potential.

In this situation, the court was warranted in limiting its decree to injunctive relief. The cases dealing with the right to profits for trade-mark infringement upon which plaintiff relies are not applicable. And since plaintiff could not show as to the unfair competition that it had sustained any probable loss in profits of any kind from defendants' use of its name, which it might otherwise have had, or any other possible direct or indirect pecuniary injury to its business rights and property, such as a cheapening of its reputation, the trial court did not err in denying damages. Cf. Vogue Co. v. Thompson-Hudson Co., 6 Cir., 300 F. 509, 512, 513; I.T.S. Co. v. Tee Pee Rubber Co., 6 Cir., 288 F. 794, 798.

The judgment is affirmed.

WOODROUGH, Circuit Judge (dissenting).

I think the courts should refuse their sanction to the attempt of the publishers of the magazine "Seventeen" to obtain monopoly rights in the word "seventeen" in the field of labels on merchandise for girls. The record makes plain that through the originality and usage of persons other than these publishers, it has come about in the extension of our linguistic implementation that a concept of the world of young women's interests may be conveyed semantically to up-to-date moderns by merely using the number seventeen. They use the number nowadays to describe all that might formerly have been covered by "sweet sixteen." The publishers made that use of it as a name descriptive of their magazine "devoted to the interests of girls." The thing described being the young women and their interests, is, of course, the most enduring topic on the human tongue. Biologically mankind must be, always has been,

and will be concerned about the interests of girls. These publishers did not create any special relation of the human race to the interests of girls or any part of the good will of the race towards girls' interests. That was infinite before their time. They have neither originated nor produced any material thing. They publish.

As I see it, these publishers put the numeral seventeen as a name on their magazine because it described the thing to which they said in their application for copyright the magazine was intended to be devoted, namely, "the interests of girls." Their expectation that people would understand the description was justified and the wide understanding of the meaning was demonstrated by the success, up to the time of trial, of the magazine. People knew what the magazine was about because the title was descriptive, and practically every normal human being has some interest in the thing described. Of course the numeral does not describe mathematically or scientifically. Girls and their interests are utterly beyond any such description. But it accomplishes the description and brings the concept of the description to the consciousness of the observer sufficiently in a way that is much better for business purposes.

Manifestly an expression or verbal label that describes and evokes in the mind "the interests of girls" is also and equally descriptive in the same way of myriads of things within the interest of girls other than magazines. I think that any one who is offering any of such things in the markets ought to be protected by the courts in the right to label them with the descriptive seventeen if he wants to. Seventeen having become long before the magazine's time a verbal symbol and a description in wide use, should be kept in the public domain and the limit of injunctive protection to these publishers (if they are entitled to any on the proof here) should be to prevent claims direct or indirect that "seventeen" articles of merchandise (i. e., of interest to girls) had been pictured, advertised or praised in their magazine if in truth they had not.

Nor am I persuaded that there is any secondary meaning to the numeral seven-

teen used as a description of interests of girls in which there can be a proprietary right. I do not doubt that when used as a label on merchandise for young women it may vaguely suggest some connection with the magazine to some people. Maybe to everyone in the magazine's employ and some others whose attention has been centered on the magazine. In the same way when the wide and merited fame of the city of Milwaukee is alluded to, it may suggest connection with a certain malt product to some people. Mention of religion may evoke thoughts of Los Angeles in many. But fame and girls' interests and religion remain broad, general, infinitely extended human interests. Individuals can identify themselves with such human interests by immersing themselves in and working in relation to them. But to identify such a vastly extensive concept as is involved in "girls' interests" with an individual is not rational. It often happens in comparatively narrow fields that names or labels on products in that field come to mean that they are of a certain origin. A particular specific product becomes identified with its origin. But I find no case where a court has ever sanctioned identification of such an infinitude of objects, actions, thoughts, fancies, emotions, and so forth, including infinitely varied fashions in dress, as are included in "girls' interests" with any person, real or corporate. I am sure that neither religion, democracy, nor "girls' interests" can rationally be so identified with any individual. The maker of a good plow with his name on it profits when plows in general become more favored and his name gives assurance of a good one. Some of the general increment of the field of plow production may be secured to him.

But I think these publishers put their magazine like a live fish into a boundless ocean, the infinitude of "girls' interests." They may rear it to Leviathan size and appetite, but they can acquire no part of the ocean. With the newsprint at their command they can identify themselves, at least in their own minds, with the "girls' interests" they describe in their title, but I am not persuaded that the boundless entirety of "girls' interests" or any one of the infinity of component elements except

their magazine, can be identified with the publishers, or that they should be accorded any special rights in respect to any element except their magazine. Their talking about girls' interests can never identify girls' interests with them, no matter how long or well they talk.