SAFEWAY STORES, Incorporated,
a Maryland Corporation,

v.

SUBURBAN FOODS, Incorporated,
a Virginia Corporation.

Civ. A. No. 1814.

United States District Court,
E. D. Virginia, Norfolk Division.

March 10, 1955.

Breeden, Howard & MacMillan, Norfolk, Va., and Garland Clarke, Washington, D. C., for plaintiff.

James G. Martin, and Kanter & Kanter, Norfolk, Va., for defendant.

BRYAN, District Judge.

"Saveway", adopted by the defendant in 1954 as a part of a trade name for a local retail self-service grocery at Norfolk, Virginia, is denounced by the plaintiff as an infringement of the trade name of "Safeway" which it has used continuously in Virginia since 1942, and elsewhere since 1926, to designate each of the cash-and-carry grocery stores in its national chain. Condemning it as unfair competition at common law, Safeway Stores, Incorporated, a Maryland corporation seeks to enjoin its continuance by Suburban Foods, Incorporated, a Virginia corporation. The defendant's threefold denial—of the existence of the requisite controversial amount to sustain diversity jurisdiction, of the exclusiveness of the plaintiff's right to the trade name, and of any infringement in fact or in law—make the issues to be resolved.

The defendant obtained its charter in 1953, immediately recorded the fictitious name of "Saveway Super Market", and commenced business in the spring of 1954. Though there is no Safeway store in Norfolk or the immediate area (the closest are in Richmond, Petersburg, Hopewell and West Point, Virginia) the defendant was well aware of the Safeway chain at the time it selected the name Saveway Super Market. It knew too that Saveway's business would be identical in character with Safeway's. At once the plaintiff protested but the defendant has refused to drop "Saveway".

In the store's overhead block-letter sign "Saveway" is emphasized by quotation marks. On billboards the word is written above, and in letters far larger than, the other parts of the name. So also in newspaper displays. The first syllable is sometimes accented, thus, "SAVEway", but always the two syllables are written together. Nearly all of its printed advertisements accentuate "Saveway", though the radio announcements repeat the full business name.

Safeway Stores, Incorporated, was chartered in Maryland in 1926. A corporation of the same name was then operating in California under a charter from that State. Maryland Safeway acquired California Safeway, as well as the stock of seven or eight other corporations, and continued as a holding company until 1943. The subsidiaries were engaged in the retail grocery business and nearly all of them traded as "Safeway". Their activities spread through California and other States of the West and Northwest. In 1928 Safeway acquired the Sanitary Grocery Company's chain of stores in Maryland, Virginia and the District of Columbia. By 1941 all of its stores bore the designation "Safeway" without further description. Beginning January 1, 1943 Safeway of Maryland, the plaintiff, absorbed all of the subsidiaries and became the sole corporate owner and operator of the stores.

"Safeway" evolved from a contest for the selection of a trade name conducted in 1924 by the plaintiff's California predecessor. Since then without break it has served as the plaintiff's insigne. For the last several years the corporation has been authorized to do business in every State; it actually operates stores in twenty-three States and the District of Columbia. Its Eastern stores are situated in New York (principally in the vicinity of New York City), New Jersey, Maryland, District of Columbia and Virginia, the last three comprising the Washington division; the other stores are in States west of the Mississippi River and in Canada.

There are 1,898 stores in the United States; 187 of them are in the Washington division and of these 71 are in Virginia. Richmond, 98 miles from Norfolk, has 18 stores, Petersburg, 79 miles from Norfolk, has 2, Hopewell, 74 miles away, has 1, and West Point, 65 miles distant, has 1; the remaining 49 are scattered throughout Virginia excepting the southwest section. Seasonally it buys large quantities of green produce from farmers about Norfolk.

In 1953 the national gross retail sales of Safeway exceeded a billion and a half dollars; in the Washington division they amounted to $176,116,274; and in Virginia $69,026,070. It was stipulated that the Virginia business had increased regularly during recent years.

The name "Safeway" has been, and is still, given widespread and extensive advertising. For 1953 alone the plaintiff spent in the United States more than 10 million dollars for this purpose. In the span from 1932 to 1953 money spent to publicize "Safeway" aggregated in excess of one hundred millions of dollars, not including the outlays in Canada. To the same end $669,726 in 1953, $594,447 in 1952, and $511,844 in 1951, with comparative sums for pri-

or years, were expended in the Washington division.

Radio, newspaper, trade journals, consumers' magazines, highway billboards, leaflets, and bus cards are the principal advertising media. No Norfolk radio, newspaper, or billboard is used. The newspapers of Richmond and Washington, D. C., and the local papers of Virginia towns and counties, all carry advertisements of Safeway. In excess of a hundred radio stations throughout the United States put "Safeway" on the air. Fifteen or twenty broadcasts weekly come from Washington and Richmond alone. The name is also commercially televised from Washington. On the principal highways in Virginia, Maryland, and the District of Columbia, including the arterial roads leading in and out of Richmond, billboards proclaim "Safeway" to motorists and bus passengers. Only a small number of Richmond papers are sold in Norfolk, and radio and television programs beamed from Richmond and Washington, it is said, do not have large audiences in Norfolk.

Investors are familiar with the name. The preferred stock of the plaintiff is listed on the New York Stock Exchange under the name "Safeway". In March, 1954, there were at least 38,000 holders of the common and preferred stock, some in every State of the Union. Each shareholder periodically receives corporate notices and reports describing the business as "Safeway".

The fair and reasonable value of the good will of the plaintiff was fixed by the evidence at seventy-seven million dollars; its good will in Virginia in excess of three million. These figures appear to be just appraisals, made pursuant to recognized formulae; they are accepted by the Court as the plaintiff's good will values, of which "Safeway" is the heart.

█ I. These facts compel the conclusion that "Safeway" has a secondary meaning. To the eye and ear of food shoppers within the area of the plaintiff's activities, the name immediately carries a reference to a Safeway store; their minds at once associate it with the plaintiff's business. Obviously fictional and fanciful—an artificial combination—it is quite eligible as a trade name. The first to obtain its coinage and to build "Safeway" into a grocer's pseudonym, the plaintiff is entitled to an exclusive use of it as against the defendant.

█ II. "Saveway" is phonetically a palpable confusion of "Safeway", a veritable idem sonans. Over the radio they are almost indistinguishable. Indeed, counsel and witnesses in questions and answers at the trial repeatedly mistook the terms. Likewise, there is visually a misleading similitude. The listener or reader gives no thought to the distinction in implication of "safe" and "save".

Nor is the confusion avoided by the additional words "Super Market", even if these be not subordinated in the display. "Home Owned", "Home Operated" or equivalent words in defendant's advertisements are altogether ineffective to distinguish "Saveway" from "Safeway". "Saveway" predominates in the accused title; it is the more misleading because of the parallel character and methods of the two stores. Differences in the store interiors and in the manner of checking out purchases are too slight to rectify the initial confusion. The correction, moreover, would come only after the patron had been attracted into the store.

█ Defendant's use of "Saveway" in its trade name, therefore, is unquestionably an unfair trade practice. It is restrainable in Virginia as unfair competition at common law. Benj. T. Crump Co. v. J. L. Lindsay, Inc., 1921, 130 Va. 144, 107 S.E. 679, 17 A.L.R. 747. True, "Saveway" is used as a title by one store in a North Carolina town, by two in West Virginia, by one in Hartford, Connecticut, by four stores in Detroit, Michigan, by some

twenty-five in Ohio, two in Albany and one in Rotterdam, New York. But Safeway does no business in any of these States except New York. The Ohio laws afford no remedy against it, the plaintiff has found; but it is about to attack the practice in court at Schenectady, New York, near Rotterdam. In these circumstances the existence of other "Saveway" stores does not dilute plaintiff's instant right in "Safeway" or mitigate defendant's offending imitation.

■ III. Deferment of the jurisdictional issue until decision upon the merits is not usual, but in this case it is justified because the merits prove the requisite jurisdictional amount. The Court of Appeals of the Fourth Circuit has expressly held that in a suit of this kind the value of the good will is the amount in controversy. General Shoe Corporation v. Rosen, 1940, 111 F.2d 95, 99. The briefs in that case disclose that the point was raised and fully argued. The conclusion is in harmony with the other circuits. Indian Territory Oil & Gas Co. v. Indian Territory Illuminating Oil Co., 10 Cir., 1938, 95 F.2d 711, 713; Hanson v. Triangle Publications, 8 Cir., 1947, 163 F.2d 74, 80; Food Fair Stores v. Food Fair, 1 Cir., 1949, 177 F.2d 177, 181; Ross-Whitney Corp. v. Smith Kline & French Laboratories, 9 Cir., 1953, 207 F.2d 190, 194. As already found, the plaintiff's good will, both in the United States generally and in Virginia alone, far exceeds $3,000.

Defendant argues that the amount in controversy is the amount of damage done, or apprehended, to the good will, citing McNutt v. General Motors Acceptance Corp., 1936, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 and KVOS, Inc., v. Associated Press, 1936, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183. But with both of these cases in mind the Court of Appeals decided General Shoe Corporation v. Rosen, supra, conclusively demonstrating the inappositeness here of McNutt and KVOS. However, if defendant's interpretation be followed, jurisdiction is still easily sustained.

As heretofore pointed out, the national good will of Safeway Stores, Incorporated, has been developed through the inculcation of "Safeway" into the minds of the purchasing public as synonymous with its store, its service, its merchandise. This direction of thought has been accomplished through the expenditure of the immense sums previously mentioned for advertising the name over the years. Energetic use of a name so confounding "Safeway" as does "Saveway", necessarily injures the plaintiff's trade name and hence its good will. With the value of the trade name as well as an account of the defendant's activity before it, the Court can, and does, readily find that the damage to the good will already inflicted, and the damage reasonably foreseeable or to be expected from the defendant's actions, in each instance far exceeds $3,000.

But the defendant contends, further, that the amount in controversy is to be measured only by the extent of the present or anticipated damage to the plaintiff's Norfolk good will, and that in the absence of a store or an advertising program in that city, neither a secondary meaning to "Safeway" nor any good will of the plaintiff exists there.

"Safeway" in this secondary sense, with the good will of the plaintiff wrapped about it, does in fact prevail in Norfolk. A broad and cosmopolitan city, Norfolk is not isolated or immured from nationwide or state-wide advertising. As the terminus of some of the great rail, ship, truck and plane routes of the nation, it must become promptly informed of every large mercantile enterprise. These carriers bring Civilian and Service travelers. Norfolk is one of the great naval bases of the United States, where thousands of Service personnel are stationed. The civilian visitors and the servicemen come from every part of the country; they come fully acquainted with the names of their favorite food stores. Furthermore, some

of the Norfolk population is bound to have been reached by the plaintiff's national advertising—and certainly by the commercial advertisements on the air, on the highways, and in the press of central Virginia—even though none of it may originate in Norfolk. Almost without exception, the witnesses called by the defendant, and testifying that "Safeway" had no specific significance to the average citizen in Norfolk, frankly conceded that they themselves knew of the Safeway store chain. To repeat, Saveway's originator and incorporator, a resident of Norfolk, was himself aware of Safeway and its operations before he created Saveway. It may be said with confidence that "Safeway" and the good will of the plaintiff have permeated Norfolk.

In the light of all the evidence, the Court finds that the defendant has injured, and if not restrained will further injure, the plaintiff's good will in Norfolk, and that this injury has amounted, and will amount, to more than $3,000. Location of the defendant's store near the main entrance to the Norfolk Naval Operating Base increases the opportunity for confusion and resulting injury. The plaintiff has proved a realistic intention and plan to establish stores in Norfolk, and this is a circumstance to be weighed in determining prospective damage.

An injunction will be granted as prayed. Actual loss of business, diversion of trade, competition, or "palming off" of defendant's goods as the plaintiff's, are not prerequisites to such a decree. Infringement of a trade name, as here established, is enough to invoke the intervention of equity—to protect the public as well as the plaintiff. Food Fair Stores v. Food Fair, supra, 177 F.2d 177.

This memorandum will serve as a statement of the Court's findings of fact and conclusions of law. Counsel for the plaintiff will present a decree within 10 days, first submitting it to opposing counsel for consideration as to form.