**TRIANGLE PUBLICATIONS, INC.**

v.

**STANDARD PLASTIC PRODUCTS, INC.**

**Civ. A. No. 37449.**

United States District Court
E. D. Pennsylvania.
March 31, 1965.

See also 241 F.Supp. 611.

Harold E. Kohn, and David Marion, Philadelphia, Pa., for plaintiff.

Charles M. Allen, Philadelphia, Pa., and Mercer L. Stockell, New York City, for defendant.

VAN DUSEN, District Judge.

Plaintiff in this action, the owner and publisher of a monthly magazine entitled "SEVENTEEN," seeks a preliminary injunction restraining the defendant, a manufacturer of plastic products, from the advertising, promotion and sale of luggage and stationery items manufactured by defendant and bearing the name "MISS SEVENTEEN." Plaintiff contends that the defendant has wrongfully capitalized upon the goodwill attached to plaintiff's trademark in the use of the name MISS SEVENTEEN on its merchandise and that, unless such unfair competition is preliminarily enjoined, plaintiff will suffer immediate, substantial, and irreparable harm for which it will have no adequate remedy at law.

A temporary restraining order was filed February 15, 1965 (Document 5) on the basis of appropriate affidavits (Documents 3 and 4). The first hearing was held on February 19, 1965 (Document 11). At defendant's request (N.T. 5 and 13), the initial hearings were confined to the jurisdictional issue, which was decided in plaintiff's favor on February 26, 1965 (Document 25).[1] Hearings on the Motion For A Preliminary Injunction commenced on March 4, 1965 (as soon as the assigned judge had concluded most of the hearings on another pending Motion For A Preliminary Injunction—Civil Action. No. 37372—which had been scheduled prior to February 26, 1965) and were concluded on March 10, 1965.[2] Requests for Findings of Fact and Conclusions of Law and Memoranda of Law (Documents 40 to 45) were filed within the following week.

This is a diversity action. It involves no federal trademark questions, but solely a question of the law of unfair competition. Plaintiff is a corporation organized under the laws of Delaware, with its principal place of business in Philadelphia, Pa. Defendant is a New Jersey corporation and has its principal place of business in that state.

Plaintiff's publication, SEVENTEEN, is a high-quality magazine devoted entirely to the interests of young girls between the ages of 13 and 19,[3] and covering such subjects as etiquette, travel, fashion and general purchasing guidance. Since the magazine was first published in 1944, it has achieved a position of preeminence among magazines in general and a unique position in the field of teenage magazines. Approximately 1,250,000 copies of SEVENTEEN are sold monthly throughout the United States, Canada and elsewhere at 50c per copy.[4] Due to the fact that the magazine is passed from girl to girl, statistics show that an average issue of SEVENTEEN is read by almost 50% of all teenage girls in the United States.[5]

Because advertising is SEVENTEEN's principal source of revenue, plaintiff has spent substantial sums over the past 20 years to establish the reputation of its magazine as an advertising medium for manufacturers, stores and other adver-

1. An application to dismiss the Complaint on the ground that personal jurisdiction could not be obtained over the defendant was denied. After presentation of evidence, the court concluded that the defendant, a non-registered foreign corporation, was doing business within the Commonwealth within the meaning of the Pennsylvania Business Corporation Law. See Memorandum and Order of February 26, 1965 (Document 25).

2. During the course of these hearings, the assigned judge suggested to defendant that they be treated as hearings on the application for a permanent injunction (N. T. 691), but the defendant did not agree to this suggestion.

3. N. T. 383–4.

4. N. T. 325, 341; Exhibit P–63.

5. N. T. 333–4.

tisers who wish to appeal to the female teenage market. Plaintiff currently spends in excess of $600,000. annually in the advertisement of its magazine in other major magazines and newspapers.[6] Advertising in SEVENTEEN currently sells for $5,000. to $7500. per page per issue.[7]

To make the magazine attractive to advertisers, SEVENTEEN regularly sells to its advertisers promotional material and merchandising aids in the form of signs, tags, counter cards, etc., bearing words such as "As Seen In SEVEN-TEEN," which are used extensively by them to take further advantage of the favorable association of the magazine in the minds of its readers.[8] At the present time, SEVENTEEN leads all other directly competitive magazines in tie-in linage—i. e., references to SEVENTEEN by manufacturers and merchants in their advertisement of their merchandise in newspapers and other magazines.[9] To further assist its advertisers in selling their products, plaintiff also periodically conducts contests, with prizes such as trips abroad.[10]

The word "seventeen" in a distinctive, lower-case script has been used by the plaintiff as the title of its magazine since it was first published in 1944, in advertisements for the magazine, on the various merchandising and promotional aids sent by plaintiff to advertisers and retailers, and on all items sold directly by plaintiff, such as cookbooks, books of etiquette, hat and shoe boxes, and notebooks.

Defendant contends that, because the word "seventeen" is a general descriptive word which has been used as a trademark by others for a wide variety of products and as a title for numerous short stories, books, songs, etc., plaintiff is not entitled to assert exclusive rights to the use of the word as a trademark. The undersigned concedes that "seventeen" is a "weak" mark. However, in this case it is not necessary to decide how far the rights of the plaintiff in the word "seventeen," as such, extend. The particular way in which the defendant has used the word is clearly violative of plaintiff's rights.

The luggage items manufactured by defendant upon which plaintiff bases its claim of unfair competition are inexpensive,[11] soft, plastic pieces on which "MISS SEVENTEEN" and sketches of luggage stickers from Hilton Hotels, TWA, Holiday Inn, and National Car Rental have been imprinted. The stationery items of which plaintiff complains are soft plastic stationery accessories, such as scrapbooks, locker vanities, pencil cases, wallets, autograph books, diaries, etc., on which "MISS SEVENTEEN" and sketches of a teenage model in various settings have been imprinted.

To promote the sale of defendant's MISS SEVENTEEN luggage, defendant is conducting a MISS SEVENTEEN Junior Luggage Contest and offering a trip to Paris as first prize. Defendant has supplied retailers featuring its MISS SEVENTEEN luggage with large counter display cards and small tags to be attached to the individual luggage pieces, all bearing information about the MISS SEVENTEEN Junior Luggage Contest and a photograph of a top teenage fashion model [12] carrying one of defendant's luggage pieces.

---

6. N. T. 339.

7. P–63, P–73.

8. Such promotional methods are not, however, exclusive with plaintiff's publication but are used extensively by other leading magazines as well.

9. N. T. 327, 329; P–79.

10. N. T. 382, 384–6.

11. Defendant's suggested retail prices range from $2.98 to $4.98. P–94.

12. As further evidence of unfair competition, plaintiff relies on the use by defendant on its merchandise and promotional material of Miss Colleen Corby as Miss Seventeen. Miss Corby has frequently been featured in and on the covers of plaintiff's publication; however, since she also frequently appears in and on the covers of teenage magazines other than plaintiff's, the court does not regard the extensive use of her photograph by defendant as a determining factor.

Defendant selected the MISS SEVENTEEN logotype appearing on all defendant's merchandise and promotional material from more than 50 versions of MISS SEVENTEEN script styles prepared for defendant by an art studio.[13] It is the opinion of this court that the defendant deliberately chose the logotype most closely resembling plaintiff's distinctive, lower-case script to take advantage of the likelihood of confusion of the two reproductions of the word "seventeen." In the version adopted by defendant, the word "miss" is printed in a smaller script, which is entirely different from and less prominent than the word "seventeen," which appears in bold type below the word "miss." The attention of the viewer is thus directed immediately to the word "seventeen," which appears in a lower-case type almost identical to the type used by the plaintiff. The main difference between the type used by plaintiff on its magazine and the type used by the defendant for the word "seventeen" is the staggered placement of the letters slightly above and below the line in the defendant's script. The letters of defendant's "seventeen" are also slightly broader and are placed in a directly upright position, whereas the letters of plaintiff's "seventeen" are on a slight slant. These differences are, however, minor and are discernible only upon close examination. The overall effect of defendant's lettering style is to mislead potential purchasers as to the source and sponsorship of defendant's merchandise and thus permit defendant to capitalize upon the goodwill attached to plaintiff's trademark.

Defendant has called the court's attention to several other products, all of which use the word "seventeen" as part of their trademarks; however, none of these items offered by defendant on which "seventeen" appears evidences a printing or lettering technique in any way resembling that employed by plaintiff.[14]

In addition to defendant's copying of the style of type of plaintiff's trademark, defendant has copied directly from the magazine itself. Defendant's advertising manager acknowledged in open court that one of the sketches appearing on defendant's MISS SEVENTEEN deskette had been copied from a photograph of one of plaintiff's models appearing in the August 1964 issue of SEVENTEEN.[15]

Defendant contends that no confusion as to the source and sponsorship of defendant's merchandise could possibly exist due to the fact that its MISS SEVENTEEN line is designed exclusively for the toy market—i. e., children between the ages of six and thirteen. It is claimed that the name MISS SEVENTEEN was selected because it would be attractive to potential purchasers, ages six to thirteen, who like to emulate teenage models and who all look upon seventeen as a glamourous, magical age when they begin to date and become young ladies. Defendant insists that its MISS SEVENTEEN articles would hold no interest whatsoever for the sophisticated and fashion-conscious young ladies to whom plaintiff's magazine is directed.

The court, however, is not persuaded. Apart from the testimony of one of plaintiff's salesmen that defendant's representative stated that it was anxious to get some "teenage merchandise,"[16] it is obvious from defendant's promotional material that the MISS SEVENTEEN sales campaign will be directed, if not in whole at least in part, to the teenage market, where the goodwill attached to plaintiff's trademark SEVENTEEN is already established. A public relations release sent by defendant to potential retail outlets states that the MISS SEVENTEEN line will be advertised on popular teen-hop television shows,[17] which appeal primari-

---

D–12, D–16, D–22, D–23, D–28—D–37 (excluding D–33).

13. N. T. 495–6; D–44A—44J.

14. D–56—62, D–66—68, D–72, D–73, D–77 (p. 409).

15. N. T. 485–6.

16. N. T. 764 and P–98.

17. P–82.

ly to high school children. Other promotional material states that the MISS SEVENTEEN Junior Fashion Luggage Contest will be open to "subteen and teeners [18] (fashionable mothers can help out)."[19] Defendant also has indicated that it will advertise its merchandise in American Girl, a magazine which is read largely by girls 13 and above.[20] In addition, the nature of the prizes offered by defendant for the MISS SEVENTEEN contest negates defendant's arguments that the contest is intended to appeal only to children 13 and under.[21]

It is generally well known in the advertising community that plaintiff does not license the use of its trademark, although it has been frequently requested to do so,[22] and the evidence makes clear that defendant was aware of plaintiff's policy in this regard. The list of possible names for its new line submitted to the defendant by its advertising agency did not include the name "seventeen" as a possible choice.[23] In addition, before defendant adopted its MISS SEVENTEEN mark, one of plaintiff's salesmen called on defendant at the request of Panitch, one of defendant's executives. At that meeting, Panitch asked the salesman about the possibility of using SEVENTEEN as a trademark for a new line. Plaintiff's salesman informed Panitch that plaintiff did not permit the use of its name by others and suggested, instead, that defendant advertise in the magazine and then utilize an "as seen in Seventeen" promotion.[24] Panitch was later present at the meeting of defendant's executives at which the trademark MISS SEVENTEEN was finally selected.[25] Thus, with knowledge the plaintiff would object to the use of SEVENTEEN as a trademark, defendant nevertheless went ahead with its plan to manufacture and promote its MISS SEVENTEEN line to the major chain, variety, department and other stores throughout the United States.

■ The court finds that the promotion and sale of defendant's MISS SEVENTEEN merchandise will detract from and cause damage to the reputation and goodwill attached to plaintiff's publication, in the development of which over the past 20 years plaintiff has spent substantial sums of money. At the present time, SEVENTEEN carries more advertising in the luggage field than any other magazine published and leads all other magazines in the advertising of women's leather accessories. SEVENTEEN is also a leader in the advertising of stationery and paper goods items.[26] The existence of luggage and stationery products bearing a trademark so closely resembling plaintiff's will obviously impair the value and distinctiveness of plaintiff's magazine as an advertising medium for luggage and stationery manufacturers. Moreover, because plaintiff has refused to license its trademark in the past for products of other manufacturers and stores who advertise in SEVENTEEN, defendant's MISS SEVENTEEN products are likely to create ill-will on the part of advertisers who are misled as to plaintiff's role in the MISS SEVENTEEN promotion.[27] To the extent that defendant's MISS SEVEN-

18. N. T. 475. Defendant's advertising director described a teenager as a child of 12 to 16 years of age.

19. Exhibit D–76.

20. An examination of the Letters To The Editor page of three 1964 issues of American Girl (D–24, D–25, D–26) revealed that the letters published were written mainly by girls 13 and above. The oldest was 19, the youngest 11. See, also, D–76.

21. First prize is a round-trip to Paris for the winner and her friend or parent, with seven days at the Hilton Hotel. Second prize is a full week's vacation for the entire family at any Holiday Inn, for which the winner will have a 1965 Ford Convertible at her service. D–76.

22. N. T. 354, 382, 386–7.

23. N. T. 486–7; D–43.

24. N. T. 755–787; P–98.

25. N. T. 454.

26. N. T. 329–31; P–76, P–77, P–81, P–83.

27. N. T. 285, 286, 311, 312, 337–9, 382, 386, 387.

TEEN articles are of a quality inferior to merchandise advertised or featured in SEVENTEEN, the sale of such merchandise will tarnish SEVENTEEN'S image in the eye of its readers and advertisers, who have come to expect the endorsement of only quality merchandise from plaintiff's publication.[28]

 In very brief summary, the record requires these factual findings, among others stated herein:

A. Defendant was aware that plaintiff would not permit the use of its copyrighted trademark by defendant on products manufactured by it, but nevertheless went ahead and intentionally used the word "seventeen" in a lower-case script closely resembling plaintiff's trademark.

B. Defendant also copied a photograph appearing in the August 1964 issue of plaintiff's magazine.

C. Plaintiff has spent considerable sums of money over the past twenty years developing the business value of its trademark SEVENTEEN, which business value is entitled to protection against wrongful misappropriation by defendant.

D. Defendant's use of its MISS SEVENTEEN trademark on goods of inferior quality will create the impression among advertisers and consumers that defendant's merchandise is associated in some way with plaintiff's magazine, and will immediately and substantially impair the value of plaintiff's trademark.

*Damages and Amount of Bond*

After receipt of the letter of 1/29/65 (Exhibit D to Complaint) from plaintiff's attorney, stating that SEVENTEEN may not be used for "articles intended for teenagers" and we shall have to "institute suit without further notice" if you do not "discontinue the use of 'Seventeen' in connection with the name or promotion of your products," defendant continued its production of the luggage and stationery items which are the subject of this suit (N.T. 697). Defendant has not shown what portion, if any, of the cost item of $44,233.17 of finished goods on D–81 was produced on or after 2/1/65 (N.T. 697). Similarly, defendant has not shown what portion of the item of $156,087.36 covering sales in January and February 1965 were made on and after February 1, 1965 (N.T. 712). Under these circumstances, the items in defendant's Requests 69a and c will be reduced as follows in computing the amount of the bond:

| | |
|---|---|
| 69a ($156,087.36, reduced as above) | $75,000.00 |
| 69c | 25,000.00 |

Since only 10% or 15% of the above $75,000. would be recoverable if the goods are returned (N.T. 684), it is clear that the cost of freight would be greater than returning the goods and, hence, the freight expense in defendant's Request 69b will not be incurred. The items in defendant's Requests 69d, e, g, and h total approximately $68,775.

 Adding this $68,775. to the $100,000. in items 69a and c, reduced as above, makes a total of expenditures incurred by defendant prior to receipt of the January 29 letter of $168,775. However, the hearing judge is not persuaded that defendant could not go forward with sales of the line of merchandise which is the subject of the suit after disposition of this action. For this reason, a bond of over $100,000. is not justified by this record.

The testimony (N.T. 660 ff. and 721 ff.) that defendant would make a profit during the pendency of this suit on the line of merchandise which is the subject of this suit is too speculative to justify allocating more than a nominal amount for possible loss of profits. If the grant of the preliminary injunction is upheld on appeal, a prompt trial can and will be arranged, since this is a non-jury case.

*Discussion of Law*

 Whether or not a Federal Court should grant injunctive relief on the

theory of dilution, as argued by defendant, it is clear that injunctive relief must be granted in this Circuit on the ground of unfair competition where there is intentional use of a distinctively printed name practically identical with a name in which plaintiff has built up goodwill and where there is intentional copying of a photograph in plaintiff's copyrighted magazine. See Ambassador East, Inc. v. Orsatti, Inc., 257 F.2d 79 (3rd Cir.1958); Sears, Roebuck & Co. v. Johnson, 219 F.2d 590 (3rd Cir.1955); Ettore v. Philco Television Broadcasting Corporation, 229 F.2d 481, 58 A.L.R.2d 626 (3rd Cir. 1956); R. H. Macy & Co., Inc. v. Macy's Drug Store, 84 F.2d 387 (3rd Cir.1936); Wall v. Rolls-Royce of America, 4 F.2d 333 (3rd Cir.1925); Waring v. WDAS Broadcasting Station, Inc., 327 Pa. 433, 194 A. 631 (1937); Pottstown Daily News Pub. Co. v. Pottstown Broad. Co., 411 Pa. 383, 192 A.2d 657 (1963). See Restatement of Torts, §§ 729, 730(b) and 731.

■ As indicated by the court in the Sears, Roebuck case, the fact that the two parties do not market the same goods or services, and thus are not in direct competition, is important but not conclusive. The court pointed out that the plaintiff, although it did not itself conduct a driving school, was closely associated with the field of driving instruction through its other activities; and, moreover, both the plaintiff and the defendant, who operated a driving school under the name "All-State," had common prospective purchasers, both of which observations apply equally to the parties in the instant case.[29]

In Comment a of § 730 of the Restatement of Torts, this language is used at pages 597–8:

"One's interest in a trade-mark or trade name came to be protected against simulation, therefore, not only on competing goods, but on, goods so related in the market to those on which the trade-mark or trade name is used that the good or ill repute of the one type of goods is likely to be visited upon the other. Thus one's interest in a trade-mark or trade name is protected against being subjected to the hazards of another's business."

Cases in other Circuits have also stated that misappropriation of the good will of another is a basis for relief. Hanson v. Triangle Publications, 163 F.2d 74 (8th Cir.1947); Triangle Publications v. Rohrlich, 167 F.2d 969 (2nd Cir.1948); Conde Nast Publications v. Vogue School of Fashion, 105 F.Supp. 325 (S.D.N.Y. 1952); Flexitized, Inc. v. National Flexitized Corporation, 335 F.2d 774 (2nd Cir.1964); Esquire, Inc. v. Esquire Slipper Manufacturing Co., 243 F.2d 540 (1st Cir. 1957). In all of these cases, there was no direct competition between the parties. The issues in the two prior cases involving Triangle Publications, supra, are almost identical with the issue in the present case, and there is no evidence of weakening of those decisions as defendant suggests. The Esquire case, however, is even more similar to this record than the two Triangle cases. There the court held that Esquire magazine was entitled to an injunction prohibiting the defendant, the Esquire Slip-

---

**29.** The court used this language at p. 593: "The fact that two parties market the same goods or services and are in direct competition with each other is important. But the absence of these factors is not conclusive. [Citing cases.]

"When we consider that all the services of plaintiff rendered under the Allstate label relate to automobiles, as do defendants' services, that plaintiff, through its financial grants and insurance discounts, is closely associated with the field of driving instruction, and that the services of plaintiff and defendants have the same prospective common purchasers, we think there is sufficient probability that confusion will result in the public's mind. Nor do we think the types of services involved are such that the public is likely through its own due care to ascertain the different sources of the driving instruction and other automotive services."

per Manufacturing Co., from using the name "Esquire" as a trade name on its merchandise, labels, containers and advertising material, except as part of its corporate name, and from using the name "Esquire" in its corporate name in the same disjointed script used by the plaintiff for its magazine. Defendant retained the right to continue to use "Esquire" in its corporate name only if the word "Esquire" was in type identical with, and no more conspicuous than, the rest of its corporate name. If merchandise, labels, containers or advertising material carried the defendant's name, said material was required to bear at least equally prominently some trade or semi-descriptive name which had no connection with "Esquire" (see p. 542, fn. 1, of 243 F.2d). The absence of a dilution statute in Pennsylvania does not make this case inapplicable in view of the Sears, Roebuck case, supra, 219 F.2d at 592–593.

Since defendant knew that plaintiff would object to the use of the word "seventeen" on its products as early as January 1965 and before it started the use of MISS SEVENTEEN (N.T. 763–5 and P–98) and, in spite of this knowledge, elected to not only use this word but to copy the lower-case script used by plaintiff for over twenty years and to copy at least one picture from plaintiff's magazine, defendant is not entitled to a denial of this Motion under the balance of convenience doctrine. Cases such as Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, 268 F.2d 569, 574 (3rd Cir. 1959), are inapplicable to the facts of alleged loss from deliberate action in violation of plaintiff's rights presented by this record. Also, defendant's contentions concerning the application of the doctrine of "unclean hands" (see p. 35 of Defendant's Memorandum of Law, being Document 41) are not based on any evidence in the record.

The pages of Exhibits D–12—D–32 and D–34—D–37 containing pictures of Miss Corby, as identified by Mr. Ford (N.T. 215–231), are received in evidence.